[No. 34606. Department Two. January 9, 1959.]

ANDERSON & MIDDLETON LUMBER COMPANY, *Respondent*, v.
LUMBERMEN'S MUTUAL CASUALTY COMPANY, *Appellant*.[1]

[1]Reported in 333 P. (2d) 938.

*Kahin, Carmody & Horswill,* for appellant.

*Clark W. Adams* and *Clarke, Clarke, Albertson & Bovingdon,* for respondent.

ROSELLINI, J.—This appeal involves the interpretation of a boiler and machinery insurance policy, and a review of the evidence concerning a loss sustained by the plaintiff in its lumbermill when a spoke of a bandsaw wheel was broken. The trial court found that the breaking of the spoke was within the coverage of the policy, and that as a result of the accident, a time loss of thirteen days was sustained. The trial court having found for the plaintiff, the evidence must be construed in its favor.

Under the terms of the policy, in so far as the claim involved in this case is concerned, the insurer was bound to pay two thousand dollars daily loss of use and occupancy plus material damage if a loss should be occasioned by an accident, defined as the sudden and accidental breaking of the bandsaw wheel, or any part thereof, into two or more separate parts while it was in use or connected for use. It was also provided that the plaintiff should use diligence, dispatch, and all reasonable means to resume business and that the defendant would pay for expenses incurred by the plaintiff in expediting its return to business.

In its mill, the plaintiff had a bandsaw driven by an upper and a lower bandsaw wheel, both eleven feet in diameter. The lower bandsaw wheel was cast in one piece, with no detachable part. On Wednesday, October 26, 1955, the saw began to oscillate more than was normal, and on Friday, it began to vibrate. On the following Monday morning soon after the saw was started, the vibrations became so severe that the saw was shut down. Inspection revealed that the band wheel was loose on one end of the shaft. The hub bolts were tightened but this did not remedy the situation.

The defendant's inspector was notified and he arrived the next day. On his arrival, he inspected the wheel and hammer-tested the spokes to see if they were cracked. This test was negative for fractures. Then he and the superintendent checked the wheel on the shaft and found that the wheel was loose on one end of the shaft although it was tight on the other. Both came to the conclusion that the basic difficulty was the looseness of the wheel on the shaft, and that the shaft should be removed from the wheel and machined. On the following Monday in the presence of the inspector, the removal was accomplished with the use of a battering ram. After the wheel was taken out of the building, it was discovered that one of the spokes was cracked all the way through and another was cracked part way through.

It was found that the wheel could not be repaired. A suitable replacement was found in Portland and was shipped on Tuesday, November 15th, to Lamb-Grays Harbor Co., Inc., for necessary machining. The wheel was delivered to the plaintiff on November 22nd. It was restored to position and ready to operate on Monday, November 28th.

In the meantime, when the wheel was removed, the plant was shut down and the installation of a new log deck was undertaken and completed sometime in December, when operations were resumed.

Experts who testified for the plaintiff described the fracture as a fatigue-type break, and attributed it to a flaw in the original casting. From their inspection of the wheel,

they formed the opinion that the breaking and cracking had occurred while in operation. One of them stated that, in his opinion, there was a gradual cracking, extending through three quarters of the broken spoke, which must have occurred over a period of from one day to three weeks, but that the breaking of the last quarter was instantaneous. It was the opinion of the other that the break occurred when the vibration of the wheel, as distinguished from its oscillation, began. Experts who testified for the defendant were of the opinion that the break occurred when the wheel was removed from the shaft with the use of a battering ram. The trial court accepted the testimony of the plaintiff's witnesses on this matter, and its finding in this regard is not challenged.

It is, however, the contention of the appellant that, accepting the testimony of the plaintiff's experts as true, the break was not one which was covered by the policy. First, it is claimed that the breaking was not sudden. It is undisputed, the defendant says, that the breaking or cracking was a gradual process which went on over a period of from one day to three weeks. The exact time when the break began was never determined.

The plaintiff answers this argument with the theory that the language of the contract pertains to the result, and not to the cause, of the accident, and that the result in this case, the final breaking, was more or less instantaneous. We agree with the position of the defendant, however, that the evidence of the plaintiff showed that the entire breaking process was not instantaneous, even though the last stage occurred in an instant.

■■■ Authorities are cited by both parties which they claim support their respective viewpoints. In none of them was the language of the insurance contract or the facts involved the same as in this case. All of the cases, however, acknowledge the general rules of construction which are applicable. The language of an insurance contract must be given its ordinary meaning unless a special or technical meaning is clearly indicated by the contract itself or by the surrounding circumstances; and where an ambiguity

exists, the contract should be construed in favor of the insured. These principles are well established in this jurisdiction. *Lesamiz v. Lawyers Title Ins. Corp.*, 51 Wn. (2d) 835, 322 P. (2d) 351.

The word "sudden" is defined in Funk & Wagnalls Standard Dictionary of the English Language as, "happening quickly and without warning; coming unexpectedly or in an instant; as, *sudden* death; *sudden* dismissal." In Webster's New International Dictionary (2d ed.), it is defined: "Happening without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for; as, a *sudden* shower, death, emergency, turn for the better, or attack of the enemy."

The purpose of the contract was to insure the respondent against an accidental breakdown of the equipment covered by the policy. The word "sudden" was, of course, placed in the contract for a purpose. Is it more reasonable to assume that it was placed there to show an intent to exclude coverage of a break which did not happen instantaneously, or to exclude coverage of a break which was unforeseen and therefore unavoidable? It seems to us that the risk to the insurer would be the same, whether a break was instantaneous or began with a crack which developed over a period of time until the final cleavage occurred, as long as its progress was undetectible. On the other hand, the insured should not be permitted to proceed recklessly and hold the insurer liable for damage if it had been forewarned of a possible break and could have taken steps to forestall it or avoid an interruption of business resulting therefrom.

A contract of insurance should be construed to effectuate its purpose, just as any other contract. There is no suggestion that the policy was not meant to cover breakage resulting from latent defects in the machinery or from fatigue. The cause is not, nor is the result, one which it is claimed is excluded. It is only contended that the result, in order to be within the coverage of the policy, must have happened instantaneously. We do not so construe the word

"sudden," when its primary meaning, in common usage, is not "instantaneous" but rather "unforeseen and unexpected." There is no suggestion that the break could have been foreseen and certainly no evidence that it was. According to the evidence, until just before the wheel was removed from the shaft and the break was discovered, the only suspected cause of the oscillation and vibration was the looseness of the wheel on the shaft.

We conclude that the trial court was justified in finding that a sudden break occurred within the meaning of the policy.

 The defendant further contends that the break was not within the coverage of the policy because the spoke was not broken into two or more separate parts. It places a highly technical construction upon the language used in the policy, and reasons that because the wheel was cast in one piece, there could be no breaking of any part thereof into "two or more separate parts" unless the entire wheel were broken in two. While this is a possible meaning of the language used, it is not a reasonable interpretation inasmuch as the definition is used with specific reference to the wheel in question, and presumptively, the contracting parties knew that it was cast in one piece. Yet the breaking of any "part" of it was covered in the policy. The word "part" therefore must be regarded as referring to a non-detachable part since the "object" had no detachable part, even though technically, the separated parts of a spoke would still be bound to each other by reason of each being attached to a part of the wheel.

For that matter, if the position of the defendant is correct, even though the spokes had been manufactured as detachable parts of the wheel, if a break had occurred in any part of the spoke which left the spoke attached to the rim and hub of the wheel, a breaking into "two or more separate parts" would not have been effected by the break which occurred. If the provision were intended to mean what the defendant suggests that it means, no accident would be covered which did not involve two simultaneous adjacent breaks unless the part was detached from the

wheel at the time of the occurrence. The purpose of the policy was to insure against accidents causing breakdowns while the machinery was assembled and in operation. It expressly excludes accidents occurring while the parts are not connected for use. The defendant's interpretation would render the provision of little value to the insured, and it cannot be inferred that such a meaning was intended. A construction in favor of the insured, which is necessary where an ambiguity exists, compels the conclusion that a breaking through of a spoke was within the contemplated coverage.

Error is assigned to the court's finding that, as a result of the breakdown, the plaintiff was forced to shut down for thirteen days, the defendant contending that, upon the evidence, a maximum of five days was required to replace the wheel and install the replacement. Actually, the plant was shut down for twenty-two working days, the time which was consumed in installing the new log deck.

The trial court recognized, and the plaintiff does not deny, that it was its duty to use diligence and dispatch and all reasonable means in order to resume business. It is also unquestioned that the plaintiff made no attempt to expedite the replacement and reinstallation of the wheel, due to the fact that the plant was shut down for the log-deck repairs and the need for the wheel was not urgent.

The use of diligence and dispatch in obtaining and installing the replacement was a condition which the plaintiff was required to meet, under the terms of the policy, in order to qualify for the per diem loss of business payments provided by the policy, and the burden was upon it to show that, with the use of such diligence and dispatch, it was required to have its mill shut down for the period of time claimed. The plaintiff offered evidence that, with reasonable diligence, the job could have been done in seventeen days. The defendant's evidence was that, with extensive overtime, the work could have been completed in five business days. The plaintiff's superintendent testified that it was regarded as impractical to work the men more than ten hours for a five-day week and eight hours on Sat-

urday, as the decline in efficiency resulting from the long hours would counteract any benefit which might result. He also stated that it was difficult to find competent men to work on a temporary job and that, due to experience, it was the policy of the company not to have people who were unfamiliar with the mill and its equipment working on the machinery.

■ The evidence also showed that the defendant's representative was in contact with the plaintiff's employees and assisted them throughout the replacement process, but there is nothing to indicate that he made any complaints or suggestions regarding the expedition of the work. This in itself does not mean that he approved the manner in which the work was being expedited, since at that time the defendant denied liability.

■ The trial court accepted the defendant's evidence regarding the amount of time required to do the machine work on the wheel, and accepted in part the defendant's and in part the plaintiff's evidence regarding the amount of time reasonably necessary to remove the wheel from the shop, locate another wheel and install the new wheel after the machine work had been done. The question was one of fact, and the evidence was in conflict. We have carefully reviewed this evidence and can find no reason to disturb the trial court's findings.

The judgment is affirmed.

HILL, C. J., DONWORTH, WEAVER, and FOSTER, JJ., concur.