**HARTFORD ACCIDENT AND INDEMNITY CORPORATION, a Connecticut corporation, Plaintiff,**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY, a Maryland corporation; El Paso Natural Gas, a Delaware corporation; Commercial Union Insurance Company, a Massachusetts corporation, Defendants.**

Civ. No. 88–C–1051J.

United States District Court, D. Utah, C.D.

Feb. 28, 1991.

Raymond M. Berry, Joy L. Clegg, Salt Lake City, Utah, for plaintiff.

Gary L. Johnson, Salt Lake City, Utah, for defendant U.S. Fidelity & Guar. Co.

Stephen Marshall, Van Cott, Bagley, Cornwall & McCarthy, Alan L. Sullivan, Salt Lake City, Utah, Nicholas J. Zoogman, Jerold Oshinsky, Anderson, Kill, Olick & Oshinsky, New York City, for defendant El Paso Natural Gas.

William W. Barrett, Kipp & Christian, Salt Lake City, Utah, for defendant Commercial Union Ins. Co.

## MEMORANDUM OPINION AND ORDER

JENKINS, Chief Judge.

## I. INTRODUCTION

On December 20, 1989, the court heard argument on two pending motions. The motions included: a Motion for Summary Judgment brought by plaintiff Hartford Accident and Indemnity Corporation ("Hartford") with respect to the "alienated premises exclusion" contained in an insurance policy (the "Liability Policy") issued by Hartford to defendant El Paso Natural Gas ("El Paso"); and a Motion to Compel brought by El Paso. The court took the Motions under advisement.

On September 19, 1990, and October 10, 1990, the court heard argument on cross Motions for Summary Judgment filed by Hartford and El Paso with respect to the "pollution exclusion" of the Liability Policy. The court also heard argument on two Motions for Summary Judgment brought by defendants United States Fidelity and Guarantee Company ("USFG") and Commercial Union Insurance Company ("Commercial"). USFG and Commercial claim that no controversy exists between Hartford and USFG, or Hartford and Commercial. The court took all Motions under advisement.

Having carefully considered the memoranda and arguments of counsel, and for the reasons set forth below, the court hereby issues its rulings:

1. Hartford's Motion for Summary Judgment with respect to the pollution exclusion is GRANTED; and

2. El Paso's Motion for Summary Judgment with respect to the pollution exclusion is DENIED.

Having based its ruling on the pollution exclusion, the court finds that it need not reach the questions presented by the parties' other pending motions.

## II. FACTS

Northwest Pipeline Corporation ("Northwest") owns and operates a natural gas transmission system which traverses the states of Washington, Oregon, Idaho, Wyoming, Utah, Colorado and New Mexico (the "System"). The System, which was constructed and placed in operation during the mid–1950's was acquired by El Paso in 1959. In 1974, El Paso sold the System to Northwest. El Paso agreed in the terms of the sale to indemnify Northwest for any

liability or expenses arising from El Paso's activities prior to transferring the System.

During the 15 years El Paso owned the System, the company used an air compressor lubricating oil, Pydraul AC, at 15 of the System's compressor sites. Pydraul AC contains the toxic substance aroclor 1254, a polychlorinated biphenyl ("PCB").[1] El Paso disposed of the used PCBs by routinely draining the contaminants directly into the ground, or periodically draining them into concrete sumps, which were later pumped out into dirt pits. Some pits contained pipes designed to discharge any waste overflow directly into the surrounding ground.[2]

In 1987, Northwest discovered the PCB contamination. Northwest reported the contamination to several government agencies, including the Environmental Protection Agency (the "EPA"). Pursuant to consent orders entered into with the EPA, Northwest cleaned up the contaminated equipment, drains, sumps, pits and surrounding ground.[3]

Relying on the sales agreement indemnification provision between Northwest and El Paso, Northwest filed a lawsuit against El Paso to recover the contamination clean up costs. El Paso agreed to pay Northwest $6.6 million dollars to settle that action. In turn, El Paso sought indemnification from Hartford, its insurance carrier, for the $6.6 million dollar settlement.[4]

On October 6, 1989, Hartford denied coverage of El Paso's claims. Hartford then instigated this action seeking a declaratory judgment that the Liability Policy excluded coverage of the PCB contamination. The narrow issue before the court, as presented in the parties' cross Motions for Summary Judgment, is whether the Liability Policy's pollution exclusion excludes coverage of such contamination.

## III. DISCUSSION

The construction of an insurance contract is a matter of law that the court can resolve in the context of a motion for summary judgment. *Adams–Arapahoe Joint School District v. Continental Ins. Co.*, 891 F.2d 772, 774 (10th Cir.1989). Contract construction remains a question of law even though the parties may disagree about the meaning of the contract, or even though one party may claim that the contract is ambiguous. *Gomez v. American Electrical Power Service Corp.*, 726 F.2d 649, 651–52 (10th Cir.1984).

The issue before the court concerns the meaning of the pollution exclusion set forth in the Liability Policy issued by Hartford to its insured, El Paso. The exclusion provides in pertinent part:

This insurance does not apply:

.  .  .  .  .

(f) To *bodily injury* or *property damage* arising out of the discharge, dispersal, release or escape of . . . toxic chemicals . . . waste materials or other . . . pollutants into or upon land, the atmo-

1. Beginning in the late 1950's members of the natural gas industry commonly used synthetic lubricants containing PCBs to lubricate air compressors. The principle advantage of such lubricants was that they were fire resistant. Manufacturers ceased making Pydraul AC in 1972. Using up inventories on hand, El Paso continued to use Pydraul AC until 1974.

2. El Paso claims that their methods of disposing of waste lubricants into dirt pits was in conformity with industry standards. El Paso believed that (i) the waste oil would seal the bottom of the pit and prevent seepage of other hydrocarbons; (ii) overflow pipes would carry uncontaminated water away from the pits; and (iii) water that was drained out of the pit or which seeped into the ground at the bottom of the pit would not be contaminated with hydrocarbons.

3. The EPA found that the PCB contamination presented an imminent and substantial endangerment to the public health or welfare of the environment. Accordingly, the EPA concluded that its clean-up orders were necessary to avoid such danger.

4. From January 1, 1976, to January 1, 1986, Hartford insured El Paso under a general liability policy. Over the years, Hartford issued a total of ten liability policies to El Paso. Each of the policies were identical in all material respects.

USFG and Commercial, the two other named defendants in this case, insured El Paso prior to 1976.

sphere or any watercourse or body of water; but this exclusion ... does not apply if such discharge, dispersal, release or escape is sudden and accidental ...

(Emphasis in original).

The exclusion expressly states that unless the discharge of toxic chemicals is *sudden and accidental,* there is no coverage under the policy. The parties disagree as to the meaning of the phrase sudden and accidental. The parties also disagree as to whether the phrase concerns the nature of the discharge, or the nature of the damages caused by the discharge.

El Paso argues that the sudden and accidental language excludes coverage only if the damage caused by the contamination was unexpected and unintended from the standpoint of the insured. El Paso claims that the history of the insurance industry shows a clear intent to provide coverage, even from gradual pollution damage, if the damage was not intentionally caused by the policy holder. In the alternative, El Paso argues that the pollution exclusion is ambiguous, and therefore should be construed against the drafter, Hartford, and in favor of El Paso.

In contrast, it is Hartford's position that the court should look at the plain meaning of the terms sudden and accidental. Hartford claims that the phrase sudden and accidental excludes coverage if the discharge of the pollutants occurred without notice and such discharge was by chance. Thus, Hartford argues that El Paso's regular and repeated discharge of waste chemicals over a period of several years was not sudden and accidental because they did not occur without notice and by chance.

### A. *The Phrase Sudden and Accidental Means Happening Without Notice and Occurring by Chance*

■ The courts are divided as to the proper interpretation of the terms sudden and accidental in the context of liability insurance. Some courts interpret the phrase to mean "unexpected and unintended." *See e.g., Anderson & Middleton Lumber Co. v. Lumbermen's Mutual Casualty Co.,* 53 Wash.2d 404, 333 P.2d 938

(1959); *New England Gas & Electric Ass'n v. Ocean Accident & Guarantee Corp.,* 330 Mass. 640, 116 N.E.2d 671, 680–81 (1953). Other courts find that the terms sudden and accidental mean "happening without notice and occurring by chance." *See e.g., U.S. Fidelity & Guaranty v. Star Fire Coals, Inc.,* 856 F.2d 31 (6th Cir.1988); *Great Lakes Container Corp. v. National Union Fire Ins. Co.,* 727 F.2d 30 (1st Cir. 1984). This court finds that the more well reasoned case law gives the phrase sudden and accidental its plain and simple meaning. Accordingly, the court is persuaded to adopt the current line of decisions which exclude coverage unless the contamination occurs without notice and such events happen by chance.

The courts adopting the plain and simple definition of sudden and accidental have uniformly found the regular and repeated discharge of waste to be excluded from coverage by the pollution exclusion. For example, in *Great Lakes Container,* the insured was alleged to have routinely discharged waste chemicals onto the site of its barrel-reconditioning facility as an aspect of its business operations. The court held that the insured's clean up cost recovery claim against its carrier fell "squarely" within the exclusion, and that no coverage existed. 727 F.2d at 33–34. Similarly, in *U.S. Fidelity,* the court found that coal dust waste generated by the normal operation of the insured, which was discharged on a routine, continuing basis, was excluded from coverage. 856 F.2d at 32. In both *Great Lakes* and *U.S. Fidelity,* the courts found that such routine and repeated discharges were not sudden and accidental.

■ Likewise, this court finds that El Paso's continuous and routine discharge of pollutants upon or into the ground cannot be construed as sudden and accidental. It is undisputed that the alleged property damage arose from El Paso's discharge of toxic chemicals onto its land. If the used PCBs were not dumped directly into the ground, the waste was discharged into dirt pits. Such discharges were the result of continuous and deliberate business practices engaged in by El Paso for 15 years.

Further, the court emphasizes that the focus of the sudden and accidental exclusion clearly relates to the nature of the "discharge, dispersal, release or escape" of the pollution itself, not to the nature of the damages caused. El Paso's claim that the *damages* were sudden and accidental mischaracterizes the relevant question before the court. The focus of the pollution exclusion, by its plain terms, is on the polluting *discharges*. If the discharge is not sudden and accidental, the exclusion is applicable, and the resultant injury or damage is not within policy coverage. Therefore, the contamination that resulted from El Paso's continuous dumping of toxic chemicals is not sudden, even if one could argue that the seepage was accidental or the resulting damage unexpected. *See Fischer & Porter Co. v. Liberty Mutual Ins. Co.*, 656 F.Supp. 132, 140 (E.D.Pa.1986).

### B. The Phrase Sudden and Accidental Is Unambiguous

The court rejects El Paso's alternative contention that the pollution exclusion is ambiguous. The court finds that the words sudden and accidental have plain, discrete and readily ascertainable meanings. Such language cannot give rise to any reasonable expectation of coverage for claims arising from repeated and continuous polluting events. A casual reading of the policy as a whole by the ordinary insured should negate any expectation of coverage with respect to such claims. *Great Lakes*, 727 F.2d at 34. As persuasively noted by the Sixth Circuit, the sudden and accidental "language is clear and plain, something only a lawyer's ingenuity could make ambiguous ... It's strange logic to perceive ambiguity in this clause." *U.S. Fidelity*, 856 F.2d at 34 (citations omitted).

The court also rejects El Paso's argument that a reading of the "occurrence" definition of the Liability Policy renders the pollution exclusion ambiguous. Under the terms of the policy, Hartford must indemnify El Paso if the property damage is caused by an occurrence, such as repeated exposure to conditions which results in property damage, that is not intended by the insured. The court finds that El Paso's theory evidences a basic misunderstanding of the construction and operation of insurance contracts. The occurrence definition and the pollution exclusion serve distinct purposes. No ambiguity is created merely because an exclusion eliminates coverage from an insuring agreement. *See Occidental Fire and Casualty Co. v. Lumbermens Mutual Casualty Co.*, 667 F.Supp. 679, 683 (N.D.Cal.1987). Polices are generally written to first define the scope of the agreement, and then to exclude the specific risks which the insurer does not cover. *Id.* *See also Crawford v. Ranger Ins. Co.*, 653 F.2d 1248, 1250–51 (9th Cir.1981) (insuring agreement's preconditions to coverage may be narrowed by other policy terms).

The broad sweep of the occurrence definition is restricted by the pollution exclusion. Specifically, the exclusion provides that the policy does not apply to injuries or damage arising from the discharge or release of pollutants. Accordingly, the exclusion relieves Hartford of any obligation to provide coverage in cases where the damage is caused by the continuous and repeated discharge of PCBs. The Liability Policy should not be viewed as ambiguous merely because the pollution exclusion excludes coverage for certain risks that the occurrence definition potentially includes.

### IV. CONCLUSION

Any property damage arising from El Paso's routine and deliberate discharges upon the land is excluded by the terms of Hartford's policy. Because there is no ambiguity in the language of the exclusion the exclusion should be enforced according to its plain terms. Accordingly, as a matter of law, the recurrent nature of the discharges do not render them sudden and accidental. Hartford's Motion for Summary Judgment must therefore be granted.

IT IS SO ORDERED