**ANACONDA MINERALS COMPANY, Arco, Inc., Bethlehem Steel Corporation, Chaparral Steel Company, Federated Metals Corporation, Marathon Steel Company, Nucor Corporation, and Tamco, Inc., Plaintiffs,**

v.

**STOLLER CHEMICAL COMPANY, INC., Jerry H. Stoller, Micronutrients International, Inc., and Matt Recycling Company, Defendants.**

**STOLLER CHEMICAL COMPANY, INC. and Jerry H. Stoller, Third–Party Plaintiffs,**

v.

**FIREMAN'S FUND INSURANCE COMPANY, the Travelers Indemnity Company of Rhode Island, American Universal Insurance Company, Great Northern Insurance Company, United States Fire Insurance Company, International Insurance Company, and Highlands Insurance Company, Third–Party Defendants.**

Civ. No. 87–C–118W.

United States District Court,
D. Utah, C.D.

Sept. 13, 1991.

Rick L. Knuth, Charles S. Brown, Glen E. Davies, Salt Lake City, Utah, for plaintiffs Armco, Inc., Bethlehem Steel Corp., Chaparral Steel Co., Federated Metals, Marathon Steel Co., Nucor Corp., and Tamco, Inc.

Gregory P. Williams, Jay D. Gurmankin, Salt Lake City, Utah, Bruce H. Jackson, David K. Olsen, San Francisco, Cal., for defendants and third-party plaintiffs Stoller Chemical Co., Jerry H. Stoller.

Mark J. Williams, Salt Lake City, Utah, William A. Savino, Daniel A. Bartoldus, Lawrence A. Levy, Anthony Eckert, Uniondale, N.Y., for third-party defendant Fireman's Fund Ins. Co.

Michael M. Later, John M. Burke, Clark Waddoups, Salt Lake City, Utah, for third-party defendant The Travelers Indem. Co. of America.

Linda L. Roth, John M. Chipman, Salt Lake City, Utah, for third-party defendant American Universal Ins. Co.

Stanley J. Preston, Max D. Wheeler, Salt Lake City, Utah, for third-party defendant Great Northern Ins. Co.

Robert L. Stevens, Salt Lake City, Utah, for third-party defendant U.S. Fire Ins. Co.

Rex E. Madsen, Jerry D. Fenn, Salt Lake City, Utah, Karen L. Bizzini, Los Angeles, Cal., for third-party defendant Highlands Ins.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This matter is before the court on third-party defendants' Motion for Summary Judgment. The court heard this motion on March 1, 1991. Plaintiffs, Anaconda Minerals Company and Federated Metals Corporation, were represented by Jeffrey E. Nelson, Michael Keller and James A. Holtkamp. Plaintiff, Armco, Inc. was represented by Glen E. Davies, Rick L. Knuth, C. Scott Brown and Mary T. Noonan. Defendant and third-party plaintiff, Stoller

Scott F. Young, Michael Keller, Jeffrey E. Nelson, David K. Isom, Salt Lake City, Utah, for plaintiff Anaconda.

Chemical Company, was represented by Gregory P. Williams and Jay D. Gurmankin. Defendant and third-party plaintiff, Jerry H. Stoller (referred to collectively with Stoller Chemical Company as "Stoller"), was represented by David A. Giannotti and K. David Olsen. Third-party defendant, Fireman's Fund Insurance Company, was represented by Mark J. Williams, William M. Savino, Daniel A. Bartoldus, Stephen J. Smirti, Jr., and Lawrence A. Levy. Third-party defendant, United States Fire Insurance Company, was represented by Robert L. Stevens. Third-party defendant, Highlands Insurance, was represented by Rex E. Madsen, Jerry D. Fenn, Robert Zeavin and Karen L. Bizzini. Third-party defendant, The Travelers Indemnity Company of America, was represented by Michael M. Later, Clark Waddoups and John M. Burke. Third-party defendant, American Universal Insurance Company, was represented by John M. Chipman and Linda L. Roth. Also present were in-house counsel for certain of the parties. Third-party defendants are referred to collectively in this Memorandum Decision as "insurers."

Before the hearing, the court carefully reviewed the memoranda submitted by the parties and all other pertinent papers in the file. After taking the matter under advisement, the court has further considered the law and the facts and now renders the following Memorandum Decision and Order.

## BACKGROUND

This case concerns which parties will bear the costs of compliance with a cleanup order ("Consent Order") issued by the Environmental Protection Agency ("EPA") and consensually entered into by the plaintiffs and defendant/third-party plaintiff Stoller under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA"). Plaintiffs seek to recover from Stoller and others the cost of complying with the Consent Order. Stoller maintains, however, that under certain comprehensive general liability insurance policies purchased from the Insurers, the Insurers must defend and indemnify Stoller in the principal action, as well as pay attorney's fees and costs for the third-party action against the Insurers.[1] The Insurers seek this court's summary judgment that they have no such duty to defend and indemnify Stoller.

The Consent Order relates to a site located approximately thirty miles west of Salt Lake City, Utah, consisting of 14.5 acres along the western foothills of the Oquirrh Mountains. Micronutrients International, Inc. ("MII") leased and operated the site ("MII plant" or "MII site") during the periods relevant to this action. MII used the site for its operation of a granular fertilizer processing plant from 1971 to early 1982.

On June 24, 1974, Stoller acquired the stock of MII and operated the MII plant until June of 1981. Stoller then sold the MII stock to Matt Recycling, Inc. ("Matt"). Matt ceased manufacturing operations at the MII plant in early 1982 and the plant has remained closed since that time.

Among other components, MII used flue dust in its manufacturing operations. MII purchased the flue dust from the plaintiff steel manufacturers. Flue dust is a by-

---

1. Because third-party plaintiffs' complaint alleges that third-party defendants have a duty to defend third-party plaintiffs, the court "must examine the complaints in the underlying actions and decide whether there are any allegations that arguably or potentially bring the action within the protection purchased or a reasonable possibility that coverage exists." *American Motorists Ins. Co. v. General Host Corp. & Amer. Salt Co.,* —— F.2d —— (No. 88–1503) (10th Cir., Mar. 21, 1991).

Plaintiffs in the original action alleged that "as a consequence of the storage of flue dust by defendants Stoller Chemical, and then Matt, the plant site sustained injury or damage and detectible amounts of lead and cadmium migrated off-site through wind and surface water runoff." Complaint at ¶ 14. This allegation comports with the facts set out later in this opinion. The complaint alleges discharges or dispersals that are neither sudden and accidental nor unexpected and unintended under the court's subsequent analysis of the pollution exclusion clauses in the subject policies. The insurers, therefore, were entitled to rely on the pollution exclusion clause; they had and have no obligation to defend third-party plaintiffs.

product of steel manufacturing. MII mixed flue dust with sulfuric acid and water to produce zinc sulfate, a granular fertilizer additive. As early as 1974, Stoller was aware the flue dust it was using contained lead, zinc, chromium, cadmium and arsenic.

During the initial period of its operation, the MII plant had no facilities for storing flue dust. Plant workers stored the dust on the ground. Later, the plant began using storage hoppers. Plant workers unloaded the dust from rail cars using conveyors and then transported the dust to the storage hoppers, which were adjacent to the railroad track. Front-end loaders also were used to transport dust to the hoppers.

From the storage hoppers, workers transported the dust by conveyor to a pugmill. There they mixed the dust with concentrated sulfuric acid and water. The dust/acid mixture next passed through a rotary kiln dryer to evaporate the moisture. The evaporation process resulted in zinc sulphate crystallization, which provided the matrix for the granular fertilizer product manufactured at the MII plant. In the final stage of production, the plant screened the dried product to remove the very small particles known as fines.

In the regular course of unloading, transporting and processing the flue dust, both workers and equipment at the MII plant spilled, released and dispersed flue dust and fines as well as off-specification materials from aborted runs. Additionally, the MII plant property harbored numerous waste piles where workers gathered and dumped large quantities of off-specification flue dust, metal processing sludge and rejected or waste materials. Waste materials also were dumped in a pit south of the manufacturing facilities.

At one point, approximately 120 tons of boron and manganese also were transported to the plant site as part of an experiment to see if they were usable in fertilizer products. When the experiments proved unsuccessful, all of the boron and most of the manganese was dumped in the waste piles at the site. Exposure to the elements regularly affected the various uncontained piles of flue dust and waste around the MII plant property.

When the MII plant ceased operating, thousands of tons of virgin flue dust, processed flue dust that failed to meet specifications, waste and other materials were left in open piles on the site. Numerous 50-gallon drums containing caustic soda solution and 6,000 gallons of sulfuric acid stored in an aboveground tank also were left at the site. At least two large truck loads of virgin flue dust were dumped on the ground after the MII plant closed because MII could not take care of the deliveries.

From the time Stoller gained ownership of the MII plant in 1974, Stoller's management had reason to believe flue dust contained hazardous materials, such as lead, arsenic and zinc. Moreover, certain members of Stoller's management knew about the personal and environmental hazards created by flue dust.

In 1977 the State of Utah issued a formal notice that the dust generated by operations inside the MII plant violated air quality standards. Utah cited Stoller for violations of those standards and ordered it to reduce airborne flue dust inside the MII plant by installing an air filtration system known as a bag house. In 1980, just before selling its interest in the MII plant, Stoller actively investigated ways to dispose of flue dust and other waste materials piled around the site.

In the spring of 1983, the EPA and the Solid and Hazardous Waste Committee of the Utah State Department of Health identified the plaintiffs in this action and Stoller as potentially responsible parties ("PRPs") under CERCLA for the pollution at the MII plant. In January, 1986, Stoller, the plaintiffs and the EPA entered into the Consent Order. The Consent Order's stated objective was to "accomplish removal activities at the site, including decontamination and/or removal of contaminated equipment, structures and debris from the site; removal of waste piles; and disposal of waste piles in a secured hazardous waste management facility." Plaintiffs and Stoller later began cleanup activities to carry

out the terms of the Consent Order. They completed Phase I of the cleanup in March, 1986.

On February 13, 1987, plaintiffs filed their complaint in this action against Stoller, MII and Matt for all remedial costs incurred by plaintiffs under the Consent Order to abate the environmental threat at the site. On August 18, 1987, Stoller filed its third-party complaint against the Insurers, claiming the Insurers are liable under the Policies for all defense costs incurred by Stoller in the defense of the plaintiffs' claims, and for indemnification of any amounts awarded in favor of the plaintiffs and against Stoller.

Fireman's Fund Insurance Company ("Fireman's Fund"), The Travelers Indemnity Company of Rhode Island ("Travelers") and American Universal Insurance Company ("American Universal") issued primary comprehensive general liability policies.[2] The policies of Highlands Insurance Company, United States Fire Insurance Company and International Insurance Company provide umbrella coverage only.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Wright*

*v. Southwestern Bell Tel. Co.*, 925 F.2d 1288 (10th Cir.1991).

Once the moving party has carried its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Gonzales v. Millers Casualty Ins. Co.*, 923 F.2d 1417, 1419 (10th Cir.1991).[3] The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Lujan v. National Wildlife Fed'n*, —— U.S. ——, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990) (quoting *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552).

In considering whether a genuine issue of material fact is present, the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir.1991).[4] Finally, all material facts asserted by the moving party shall be deemed admitted unless specifically controverted by the opposing party. D.Utah R. 202(b)(4).

## DISCUSSION

The court's decision in this case turns on interpretation of the pollution exclusion clauses in the comprehensive general liability policies issued by Fireman's Fund, American Universal and Travelers (the

---

**2.** Fireman's Fund does not insure Stoller. Its policy lists Pharos Enterprises, the initial operator of MII, as the named insured and names Jay Hill and MII as additional insureds. Fireman's Fund has reserved the right to dispute Stoller's alleged entitlement to insurance coverage under its policy.

**3.** The summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere plead-

ings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

**4.** "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

"policies"). Because the pollution exclusion clauses are unambiguous the court has accorded them, as a matter of law, their ordinary meaning. Moreover, there is no genuine issue as to the material facts underlying the polluting events at the MII site. Taken together, the pollution exclusion clauses and the facts of this case bar coverage under the policies.[5]

Because the court has based its decision on the pollution exclusion clauses and their exceptions, those clauses contain the critical policy language to be analyzed in this dispute.[6] The policies cover only what they term "occurrences."[7] The policies' coverage of occurrences is subject to certain exclusions, and some of the exclusions contain exceptions. Without deciding the issue, the court has assumed the polluting acts and events at the MII site were occurrences because coverage is nonetheless barred by the policies' pollution exclusion clauses.

5. Third-party defendants have asserted other arguably determinative grounds for summary judgment. The court did not reach those grounds, however, instead basing its decision on the applicability of the pollution exclusion clauses and the inapplicability of their exceptions.

6. The pollution exclusion clauses in both the Fireman's Fund and the American Universal policies apply to:
 bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalies, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water.... 
The clauses conclude with an exception to the exclusion:
 but this exclusion does not apply if such *discharge, dispersal, release* or *escape* is *sudden and accidental.*
The pollution exclusion clause in the Travelers policy excludes coverage for:
 bodily injury or property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant
 (i) if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any insured or any person or organization for whose acts or omissions any insured is liable.

7. "Occurrences" are covered unless the occurrences arise out of polluting events; those are

The only exceptions to the pollution exclusion clauses in the Fireman's Fund and American Universal policies extend coverage to "sudden and accidental" discharges, dispersals, releases or escapes (referred to collectively as "discharges") of contaminants or pollutants. The Travelers policy's pollution exclusion clause excludes coverage of damages arising out of polluting emissions, discharges, seepages, releases or escapes (also referred to collectively as "discharges") when they are "expected and intended" from the standpoint of the insured. Therefore, the policies extend coverage, despite the pollution exclusion clauses, if the polluting events at the MII site were sudden and accidental or unexpected and unintended.

■ The court's decision turns on interpretation of contract language, and the court must decide such substantive issues of contract interpretation under applicable Utah law.[8] Under Utah law, insurance

not covered unless the polluting events are sudden and accidental (unexpected and unintended in the case of the Travelers policy). Read as a whole, the policies here cover "continued and repeated exposures" except for exposures to pollution; then they cover only "sudden and accidental" or unexpected and unintended discharges. *American Motorists Ins. Co. v. General Host Corp.,* 667 F.Supp. 1423, 1429 (D.Kan. 1987), *aff'd,* —— F.2d ——, 1991 WL 35967, 59 U.S.L.W. 2648 (10th Cir., Mar. 21, 1991).

8. The parties have not brought to the court's attention to any conflict of laws issue necessitating a choice-of-law decision, and they have cited the court to almost exclusively Utah contracts law. Nonetheless, a brief analysis of the choice of law issue is in order.
 The court's jurisdiction in this case is predicated on a federal question, but involves common law questions of contract not addressed by CERCLA. Utah choice-of-law rules determine which state's contract law the court will apply. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) (there is no federal general common law); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (when federal courts decide cases within scope of Erie doctrine, they must employ choice-of-law rules of the state in which they sit).
 When presented with contract claims, Utah courts generally have applied the law of the place of contracting. *See, e.g., Gressler v. New York Life Ins.,* 108 Utah 173, 156 P.2d 212, 214 (1945). Under this analysis, Utah contract law

contracts are construed according to general contract principles. *Bergera v. Ideal Nat'l Life Ins. Co.*, 524 P.2d 599, 600 (Utah 1974). When interpreting a contract, a court must give language its usual and ordinary meaning. *Commercial Bldg. Corp. v. Blair*, 565 P.2d 776, 778 (Utah 1977). Moreover, the court must assume the drafters used all language in an insurance contract for a purpose and must give that language effect if it is clear and unambiguous. *Marriot v. Pacific Nat'l Life Assurance Co.*, 24 Utah 2d 182, 467 P.2d 981, 983 (1970).

■■■ Whether contractual language is ambiguous is a question of law the court must decide. *Morris v. Mountain States Tel. & Tel. Co.*, 658 P.2d 1199, 1200 (Utah 1983). If contract terms are clear and unambiguous, the court also may interpret the intent of the parties as a matter of law. *Gomez v. Amer. Electric Power Serv. Corp.*, 726 F.2d 649, 651–52 (10th Cir.1984) (applying Utah law). The court only construes policy language against the insurer when that language is ambiguous. *See Fire Ins. Exchange v. Alsop*, 709 P.2d 389, 390 (Utah 1985). These principles of Utah contract law guide the court's analysis of the pollution exclusion clauses and their exceptions.

## I. The "Sudden and Accidental" Exception

■■ The sudden and accidental exception removes an otherwise uncovered polluting occurrence from the pollution exclusion clause only if that polluting occurrence was both sudden *and* accidental. If a discharge, dispersal or release of pollutants or contaminants into the environment was either non-sudden or non-accidental, that polluting event is not covered. The polluting events at the MII site were neither sudden nor accidental.

### A. "Sudden"

■■ Third-party plaintiffs argue "sudden," as used in the exception to the exclusion, is ambiguous and should be construed in favor of the insureds to mean unexpected or unforeseen. The insurers argue "sudden" is unambiguous and has an ordinary meaning with a temporal element that makes it synonymous with "abruptly" or "quickly." The court agrees with the insurers.

The meaning of "sudden" in this context has spawned extensive litigation between insureds and insurers. Although the United States Court of Appeals for the Tenth Circuit has not ruled on the issue, it has noted the split of authority in the case law. *See American Motorists Ins. Co. v. General Host Corp. & Amer. Salt Co.*, 946 F.2d 1482, 1486 (10th Cir.1991) ("There is a sharp division of authority on the issue of whether pollution that occurs over an extended period of time is 'sudden' within the meaning of the pollution exclusion.").

This court is persuaded by the rationale underlying the majority of recent cases finding sudden to have a temporal element and holding that routine discharges of pollutants or contaminants, over a lengthy period, are not sudden discharges.[9] Courts

---

applies because MII was a Utah business whose various owners contracted in Utah to insure MII's Utah operations.

The *Restatement (Second) of Conflict of Laws*, is another basis for choice-of-law analysis by Utah courts. *See, e.g., Forsman v. Forsman*, 779 P.2d 218, 219 (Utah 1989) (applying *Restatement (Second) of Conflict of Laws* to choice-of-law question in tort case). The *Restatement* also points to Utah as the jurisdiction with the most significant relationship to the controversy. In construing a contract for liability coverage, the state where the risk in controversy is located has the most significant relationship to the dispute and is the state whose substantive law should be applied. *See Restatement (Second) of Conflict of Laws* § 193 and comments a and f;

*see also Sharon Steel v. Aetna Cas. & Sur. Co.*, Nos. C–87–2306 & C–87–2311 at 28 (3rd Dist. Utah, July 20, 1988) (reviewing Utah choice-of-law rules and applying same *Restatement* sections in context of coverage issues related to CERCLA case). Because the pollution damaged site is in Utah, Utah's interests in this dispute predominate over any other state whose law arguably might apply.

**9.** *See, e.g., Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc.*, 938 F.2d 1423 (1st Cir.1991) (ongoing pollution is not sudden); *Northern Ins. Co. of New York v. Aardvark Assoc. Inc.*, 942 F.2d 189, 191 (3rd Cir.1991) (under Pennsylvania law sudden adds to "sudden and accidental" the temporal element of abruptness or brevity);

need not impose a constrictive legal meaning on sudden to find it unambiguous. Nor does it strain common sense or usage to define sudden as having a temporal element. Especially in the context created by the phrase "sudden and accidental," the ordinary meaning of sudden makes it synonymous with abrupt or instantaneous.

Moreover, the Tenth Circuit has defined "accidental" to mean "not expected or intended." *See American Motorists*, 946 F.2d at 1484. To strip "sudden" of its temporal element and define it as meaning "unexpected," as the insureds suggest, would render "accidental" mere surplusage in the sudden and accidental exception. This would be contrary to Utah contract law, which requires the court to assume all language in a contract has a purpose and must be given effect. *See Marriot v. Pacific Nat'l Life Assurance Co.*, 24 Utah 2d 182, 467 P.2d 981, 983 (1970).

Finally, even a tortured definition of "sudden" would not encompass routine operations at the MII site and the concomitant polluting events. It is undisputed that routine handling and storage of pollutants

at the MII site exposed the environment, on a continual basis, to flue dust, manufacturing by-products and waste. Except for the effects of wind and surface water run-off, which are discussed below, the court sees nothing even remotely "sudden" about ongoing and regular polluting events. Because the polluting events at the MII site were not sudden, the exceptions to the pollution exclusion clauses in the American Universal and Fireman's Fund policies do not apply and those polluting events are not covered.

## B. "Accidental"

■ The Tenth Circuit recently defined "accidental" as that term is used in the sudden and accidental exception to the standard pollution exclusion clause. *See American Motorists*, 946 F.2d at 1486. Consistent with other cases, *American Motorists* defines "accidental" as "not expected or intended by the insured." *Id.* at 1487 (citing other cases). Placing this definition in context, the pollution exclusion clause "does not apply if such discharge, dispersal, release or escape is sudden and [not expected or intended by the insured]." [10]

*State of New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1428–29 (2nd Cir.1991) (under New York law, for a release or discharge to be sudden it must occur over a short period of time); *Grant–Southern Iron & Metal Co. v. CNA Ins. Co.*, 905 F.2d 954, 956–57 (6th Cir.1990) (under Michigan law "sudden and accidental" exception does not apply to continuous or ongoing occurrences); *United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31, 34 (6th Cir.1988) (under Kentucky law "sudden and accidental" unambiguously describes polluting events that are "'not only ... unexpected, but [which happen] instantaneously or precipitantly.'") (citation omitted); *Hartford Accident and Indemnity Corp. v. United States Fidelity and Guaranty Co.*, 765 F.Supp. 677, 680–81 (D.Utah 1991) (continuous dumping of toxic chemicals is not sudden); *United States Fidelity & Guar. Co. v. Morrison Grain Co.*, 734 F.Supp. 437 (D.Kan.1990) ("sudden and accidental" unambiguously includes a temporal element); *Industrial Indem. Ins. Co. v. Crown Auto Dealerships, Inc.*, 731 F.Supp. 1517 (M.D.Fla.1990) ("sudden" has temporal element); *A. Johnson & Co. v. Aetna Casualty & Sur. Co.*, 741 F.Supp. 298 (D.Mass.1990) (only an abrupt discharge or release of pollutants falls within exception and gradual occurrences are not covered); *Ray Indus., Inc. v. Liberty Mutual Ins. Co.*, 728 F.Supp. 1310 (E.D.Mich.1989) (sudden includes tempo-

ral element); *Becker Electronics Mfg. Corp. et al. v. Granite State Ins. Co.*, No. 86–CV–1294 unpublished, 1989 WL 63671 (N.D.N.Y. June 12, 1989) (sudden includes temporal element); *Sharon Steel v. Aetna Cas. & Sur. Co.*, Nos. C–87–2306 & C–87–2311 at 28 (3rd Dist.Utah, July 20, 1988) (without referring to dictionaries, case law or parol evidence, reasonably prudent person would interpret "sudden" as including "temporal condition of being instantaneous and abrupt").

10. It is possible to read *American Motorists* as holding that accidental pollution occurs only when the insured does not expect or intend the polluting discharge *or* the resulting damage. *See American Motorists*, —— F.2d at —— ("The courts have interpreted "accidental" to refer to *pollution* which is not expected or intended by the insured.") (emphasis added). Such a reading of *American Motorists*, however, is ill-advised for several reasons. First, the sudden and accidental exception must be read in the context of the pollution exclusion clause, which focuses specifically on the discharge, not the resulting damage. Second, *American Motorists* rests on cases that interpret the exception, in context, as referring to the discharge, not the resulting damage. Finally, the insureds intent and expectation as to the property damage is the inquiry undertaken to determine whether there is an

Therefore, under the pollution exclusion clause, the court need only inquire whether the insured intended the *discharge* of the pollutants. If the insured intended the discharge, the pollution exclusion bars coverage by the policy. The court need not consider whether the insured intended or expected the pollution *damage* caused by the discharge.

The insureds have attempted to raise an issue of fact as to whether they expected and intended to cause pollution damage to the MII site and the surrounding area. The insureds have not raised a genuine issue of material fact, however, as to whether they intended and expected the discharge of flue dust and other contaminants. Indeed, the nature of routine manufacturing operations at the MII plant undisputedly establishes that the insureds expected and intended to expose the MII site and surrounding area to certain substances by their discharge.

From its inception until its close, the MII plant regularly exposed the environment to flue dust, waste and manufacturing by-products. Whether the insureds knew the hazardous and polluting nature of those substances is not germane to analyzing whether a discharge was accidental. Because the ongoing discharges of various pollutants at the MII site was not accidental, the American Universal and Fireman's Fund policies bar coverage under their respective pollution exclusion clauses.

II. *The Unexpected and Unintended Exception*

The Travelers pollution exclusion clause excludes polluting discharges from coverage unless those discharges are unexpected and unintended from the standpoint of the insured. As previously discussed, the Tenth Circuit has defined "accidental" to mean unexpected and unintended. Therefore, the court's analysis of "accidental" applies to the Travelers pollution exclusion.

As with the American Universal and Fireman's Fund policies, the issue with the

Travelers policy is not whether the insureds intended and expected plant operations to pollute. The focus of the Travelers pollution exclusion is simply whether the insureds intended and expected to allow or cause pollutants to enter the environment. *See Travelers Ins. Co. v. Waltham Indus. Laboratories*, 722 F.Supp. 814, 824–25 (D.Mass.1988), *aff'd in part, rev'd in part*, 883 F.2d 1092 (1st Cir.1989) ("Since the policy does not require a showing that the *result* of the discharges be unintended for coverage to be excluded under the pollution exclusion, it is sufficient here to recognize that the expected continual release of pollutants prevents [the insured] from claiming coverage from Travelers."); *Fireman's Fund Ins. Co. v. Ex–Cell–O–Corp.*, 662 F.Supp. 71, 75–76 (E.D.Mich.1987) ("An occurrence policy containing a pollution exclusion covers property damages caused by pollution only if *both the property damage and the release of pollutants* is unexpected and unintended.").

Because of the undisputed facts describing routine operations at the MII plant, the court must conclude that the insureds intended and expected that flue dust would be dispersed onto the MII site and into the surrounding environment. *See Deseret Fed. Savings & Loan Assoc. v. United States Fidelity & Guar. Co.*, 714 P.2d 1143, 1146 (Utah 1986) (in adopting an objective standard for "occurrence," court held that courts may infer that insured intended natural and probable consequences of its intentional acts).

Third-party plaintiffs have not raised a genuine issue of material fact in their attempt to controvert the undisputed facts as to routine operations at the MII plant. Consequently, the Travelers pollution exclusion clause bars coverage of the relevant polluting events.

III. *Wind Gusts and Surface Water Run-off*

■ The insureds argue that, apart from routine discharges at the MII site,

---

insured "occurrence" within the meaning of the occurrence clause. To make the sudden and accidental exception merely repetitious of the

occurrence clause would transgress Utah contract law, which requires giving effect to all language in a contract.

wind and surface water run-off sometimes moved and resettled uncontained flue dust and other contaminants. Thus, they contend, there are genuine issues of material fact at least regarding which discharges or dispersals at the MII site were induced by the elements, and, consequently, were sudden and accidental as well as unexpected and unintended.

When the MII site was abandoned, all of the pollutants and contaminants identified for cleanup in the EPA Consent Order simply were left on the site. The insureds have not disputed that the bulk of the costs relate to cleanup of the MII site almost a year after it was abandoned—long after plant operations ceased being affected by wind and surface water run-off.[11]

The record shows that nothing sudden and accidental or unintended and unexpected necessitated removal of the remaining piles and pits of pollutants or the demolition and removal of abandoned buildings, equipment, scrap metal and railroad tank cars containing acid. Those pollutants and contaminants represent the bulk of the material requiring cleanup. With regard to the eventual on-site cleanup, no genuine issue of material fact has been raised as to polluting events induced by wind and surface water run-off increasing cleanup costs.

Even if the insureds had asserted sufficient facts to support their theory that the elements contributed significantly to cleanup costs at the site, the related polluting events still would not be sudden and accidental or unexpected and unintended. The parties do not dispute that flue dust and other contaminants at the MII site were stored in open piles and were handled in a way that allowed regular dispersal into the air and surrounding environment.

Such handling and storage was ongoing despite the inevitable and foreseeable consequence of exposure to the wind and surface water run-off. From the undisputed facts relating to plant operations, the court finds that the insureds impliedly intended the natural and probable consequences of their intentional acts (*i.e.*, regular dispersal of flue dust and other substances into the environment). *See Deseret Federal*, 714 P.2d at 1146.

Intentional and routine discharges of pollutants into the environment do not qualify as sudden and accidental or unintentional and unexpected; although unpredictably, the elements acted on pollutants at the MII site inevitably and foreseeably. If the court held otherwise, the exceptions to the pollution exclusion clauses always would apply because the elements unavoidably will interact with pollutants released into the environment.

The court's holding today is analogous to the holdings of other courts that have considered insureds attempts to distinguish discrete episodes of pollution from routine operations over the years. *See, e.g., Lumbermens Mutual Casualty Co. v. Belleville Indus., Inc.*, 938 F.2d 1423 (1st Cir. 1991) (polluting effects of fire and of flood from rainstorm were not sudden and accidental because they caused release into environment of same pollutant as was routinely released by manufacturer's regular operations); *Industrial Indem. Ins. Co. v. Crown Auto Dealerships, Inc.*, 731 F.Supp. 1517, 1520–22 (M.D.Fla.1990) (storage of waste oil sludge in open, unlined storage ponds, causing occasional runoff during major rainfalls and regular leaching out, were gradual, normal results of recycler's operations rather than series of abrupt or sudden events); *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.*, 750 F.Supp. 1340 (E.D.Mich.1990) (in context of ongoing groundwater contamination from day-to-day manufacturing practices, tank spill and pipe rupture were part of pollution expected by manufacturer); *Ray Indus., Inc. v. Liberty Mutual Ins. Co.*, 728 F.Supp. 1310, 1318–20 (E.D.Mich.1989) (occasional puncturing and crushing of 55–gallon drums of waste deposited in landfill over 13–year period, notwithstanding discrete nature of

---

**11.** The Consent Order mandated removal activities at the site, including decontamination and/or removal of contaminated equipment, structures and debris from the site; removal of waste piles; and disposal of waste piles in a

secured hazardous waste management facility. *See* United States Environmental Protection Agency, Administrative Order On Consent, No. CERCLA VIII–86–01 at 3–4.

**1508**

each event, amounted to regular discharges and were not sudden and accidental in each instance of spillage); *Fischer & Porter Co. v. Liberty Mutual Ins. Co.*, 656 F.Supp. 132, 136 (E.D.Pa.1986) (in context of routine business operations causing pollution, tank spillage was not sudden and accidental). In view of MII's regular operations, the inevitable influence of the elements did not make MII's routine discharges or occasional dispersals by the elements either sudden and accidental or unexpected and unintended.

### CONCLUSION

Insurance coverage for the polluting events underlying this lawsuit is barred by the pollution exclusion clauses in the relevant policies.

Accordingly,

IT IS HEREBY ORDERED that third-party defendants' Motion for Summary Judgment is granted. Third-party defendants are to prepare an appropriate judgment in accordance with this Memorandum Decision and Order.