[No. 59616-6.    En Banc.    September 9, 1994.]

KEY TRONIC CORPORATION, INC., *Appellant*, v. AETNA
(CIGNA) FIRE UNDERWRITERS INSURANCE COMPANY, ET
AL, *Respondents*.

*Stoel Rives Boley Jones & Grey*, by *Stevan D. Phillips* and *Ann M. Holmes*, for appellant.

*Simburg, Ketter, Sheppard & Purdy*, by *Melvyn J. Simburg* and *Jonathan I. Feil; Wilmer, Cutler & Pickering*, by *Lynn Bregman, John J. Kim*, and *Dennis W. Flannery*, for respondents Aetna Fire Underwriters, et al.

*Lee, Smart, Cook, Martin & Patterson*, by *Michael J. Bond*, for respondent Transamerica Insurance Group.

*Frank Conklin; Donald C. Brockett, Prosecuting Attorney*, and *James Emacio, Chief Deputy*, amicus curiae for appellant.

*Charles C. Gordon, Nicholas P. Gellert*, and *Paul R. Carlson* on behalf of The Boeing Company; *John C. Buchanan, James R. Murray, Eric C. Bosset*, and *Philip D. Golrick* on behalf of The Boeing Company and ASARCO, Inc.; *Robert M. Horkovich* on behalf of Champion International Corporation and Joseph Simon & Sons, Inc.; *Dennis G. Opacki* on behalf of Paccar Inc., amici curiae for appellant.

*Thomas S. James, Jr., Thomas W. Brunner, Robert B. Bell*, and *Lon A. Berk* on behalf of The Insurance Environmental Litigation Association, amicus curiae for respondents.

BRACHTENBACH, J. — The trial court granted summary judgment in favor of six insurers, holding that as a matter of law pollution exclusions in their insurance policies preclude coverage for damage due to groundwater contamination resulting from leachates from toxic wastes disposed of at a Spokane County sanitary landfill by Key Tronic Corporation.

We reverse the trial court, and remand in light of our analysis herein and in *Queen City Farms, Inc. v. Central*

*Nat'l Ins. Co.*, 126 Wn.2d 50, 882 P.2d 703, 891 P.2d 718 (1994). Plaintiff Key Tronic Corporation, Inc. (Key Tronic), is a Washington corporation which manufactures computer keyboards in Spokane. As part of the manufacturing process, Key Tronic used a number of chemicals, including 1,1,1 Trichloroethane (1,1,1 TCA) and methylene chloride. These chemicals would become saturated with residue materials in the process, and become unusable. From about 1973 to 1975 Key Tronic hauled these wastes in 55-gallon drums to the Mica landfill in Spokane.

In 1975, Spokane County directed Key Tronic to deliver the liquid waste to a licensed sanitary landfill at Colbert rather than to the Mica site. The Colbert site was established in 1968. The Spokane County Health Department issued the operating permit for the Colbert site, while Spokane County owned and operated the landfill. Key Tronic hauled the wastes in barrels to the Colbert landfill and dumped the contents into the landfill. Key Tronic was instructed to open the barrels and drain them into the landfill.

During the period from 1975 to 1980 Key Tronic averaged one trip every 6 weeks to the landfill, annually disposing of thousands of gallons of liquid waste containing 1,1,1 TCA and methylene chloride. 1,1,1 TCA is an extremely hazardous waste.

In the fall of 1980, the Washington State Department of Ecology tested wells around the landfill and found that 1,1,1 TCA was present in higher than acceptable quantities. Numerous third party suits were brought against Key Tronic for personal injury and property damage resulting from groundwater contamination due to leaching of the waste chemicals from the landfill. One group of plaintiffs obtained a jury verdict which was upheld in *Wilson v. Key Tronic Corp.*, 40 Wn. App. 802, 701 P.2d 518 (1985).

In August 1983, Colbert was designated as a national priority list site under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq.* (1980). In 1986, Key Tronic

was notified it was a potentially responsible party under CERCLA, and in 1988 Key Tronic entered into a consent decree with the Department of Ecology and the United States Environmental Protection Agency under which it was obliged to pay $4.2 million to clean up the groundwater in and around Colbert.

Key Tronic was insured by several companies during the relevant period. On November 17, 1987, Key Tronic brought a declaratory judgment action against 11 of its primary and excess liability insurers, requesting clarification of the insurers' obligations to indemnify Key Tronic for damages and cleanup costs due to the groundwater contamination resulting from disposal of the wastes at the Colbert landfill. Six of the insurers remain in the action.

The six insurers moved for summary judgment, arguing that the policies issued to Key Tronic did not provide coverage for liability resulting from Key Tronic's intentional discharge of chemical wastes into the Colbert landfill. Although there are some variations in language in the policies, the trial court held, and there is no dispute about that holding, that the pertinent sections of the policies are "for all practical purposes . . . identical". Clerk's Papers vol. 12, at 1837. Thus, for purposes of this appeal, the policies provide:

> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . bodily injury or . . . property damage to which this insurance applies, caused by an occurrence . . ..

Clerk's Papers vol. 5, at 688 (Aetna (CIGNA) fire policy). An occurrence "means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured". Clerk's Papers vol. 5, at 693.

The insurers conceded for the purposes of the summary judgment motion that there were disputed issues of fact as to whether coverage was provided under the occurrence clauses of the policies. They argued, however, that coverage

was excluded as a matter of law under the pollution exclusion clauses in the policies.

The policies exclude coverage for

bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental . . ..

Clerk's Papers vol. 5, at 688 (Aetna (CIGNA) fire policy). This exclusion is known as the "qualified pollution exclusion" and is found (first as an endorsement and then in the body of the policy) in standard comprehensive general liability (CGL) policies from 1970 to 1986. The last clause of the exclusion is an exception, which reinstates coverage if the "discharge, dispersal, release or escape" of the pollutants is "sudden and accidental".

The trial court granted the insurers' summary judgment motion. The trial court held that discharging the waste on the ground at the Colbert landfill was a "purposeful, planned and intentional act" which was performed repeatedly over 5 years; thus, the discharge was not accidental and therefore was not "sudden and accidental" within the meaning of the exception to the exclusion. The trial court held the pollution exclusions in the insurers' policies preclude coverage as a matter of law.

Key Tronic appeals the summary judgment. Certification was accepted from Division Three of the Court of Appeals.

The issues raised by the parties in this case mirror, for the most part, the issues in *Queen City Farms*, filed this day. We will not repeat the extensive analysis contained in that decision here, but will instead briefly summarize the holdings there which apply here. The parties are directed to the published opinion in *Queen City Farms* for further explication of the issues. We also address here certain arguments not made in *Queen City Farms*.

In reviewing the propriety of a summary judgment, the appellate court engages in the same inquiry as the trial

court. *Our Lady of Lourdes Hosp. v. Franklin Cy.*, 120 Wn.2d 439, 451, 842 P.2d 956 (1993). Summary judgment is proper if

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

CR 56(c).

> Facts and the reasonable inferences therefrom are considered in favor of the nonmoving party, and summary judgment should be granted in favor of the moving party only if reasonable minds could reach but one conclusion from all the evidence.

*Our Lady of Lourdes*, at 452; *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

Key Tronic argues that the insurers concede that the groundwater contamination was unexpected and unintended and therefore was an occurrence. Key Tronic further maintains that the pollution exclusion essentially restates the occurrence definition. Key Tronic contends that there is no guidance as to whether the "sudden and accidental" exception includes authorized disposal of wastes at a sanitary landfill, but that, assuming it does, there is more than one "discharge, dispersal, release or escape" involved here, *i.e.*, the initial depositing of the wastes in the landfill and the later escape of toxic material from the landfill to the groundwater. Because the exclusion is drafted in the disjunctive ("discharge, dispersal, release *or* escape"), Key Tronic reasons, and the escape which contaminated the groundwater was concededly unexpected and unintended, the exclusion should not apply. In any case, Key Tronic maintains the use of the term "or" injects ambiguity into the exception, and argues that it ultimately means that every phase of dispersal is nonaccidental if any phase is nonaccidental.

In contrast, the insurers primarily argue that summary judgment should be affirmed because it is undisputed that Key Tronic knew it was disposing of highly toxic waste materials, that it deliberately decided to dispose of the

chemical wastes at the Colbert landfill and did so for more than 5 years in the regular course of its business. The insurers maintain that under the qualified pollution exclusion the damage resulting from the disposal was excluded as a matter of law. The insurers argue that the exception to the exclusion does not reinstate coverage because the disposal was not "accidental", and therefore was not "sudden and accidental" as a matter of law.

Contrary to Key Tronic's contention, the insurers in this case did not concede that a covered occurrence happened. Instead, the insurers agreed there were disputed issues of fact as to whether there was an occurrence, and the trial court assumed, only for purposes of summary judgment as to the legal import of the pollution exclusion, that there was a covered occurrence. Also contrary to Key Tronic's argument, the pollution exclusion and the occurrence definition are not coextensive, as explained in *Queen City Farms*, at 74-78, 86-88. The focus of the pollution exclusion is on the polluting event, while the question of expectation and intention in the occurrence definition focuses on the resulting damage.

As to Key Tronic's argument that there may be two relevant events, we first dispose of two challenges raised by the insurers. The first challenge is that Key Tronic did not raise this issue at the trial court, and is therefore precluded from raising it on appeal. Key Tronic argued to the trial court that the dispersal was not expected nor intended, and that the contamination and leaking were unexpected and unintended. The question of what event is the relevant polluting event was sufficiently before the trial court.

The second challenge, raised by one insurer, is that the "two relevant discharges" argument must be rejected under Washington's "efficient proximate cause" rule. That rule applies where a covered peril sets in motion a causal chain the last link of which is an uncovered peril. "If the initial event, the 'efficient proximate cause,' is a covered peril, then there is coverage under the policy regardless whether subsequent events within the chain, which may be causes-in-fact

of the loss, are excluded by the policy." *Safeco Ins. Co. of Am. v. Hirschmann,* 112 Wn.2d 621, 628, 773 P.2d 413 (1989). The rule cannot be circumvented by an exclusionary clause; an exclusionary clause drafted to circumvent the rule will not defeat recovery. *Hirschmann,* at 629.

The insurer here reasons that the converse of this rule should apply, *i.e.,* where an excluded risk sets in motion a causal chain, coverage should be precluded as to all the causal events in the chain. As Key Tronic aptly points out, however, the efficient proximate cause rule operates in favor of coverage. A converse rule would, of course, operate in favor of no coverage. Other than maintaining that the efficient proximate cause rule should apply to excluded acts which are the efficient proximate cause, and that it is "settled law", the insurer offers no other reasoning why the rule should be applied to preclude coverage. Because policies should normally be construed in favor of coverage, because there is no settled law favoring this argument, contrary to the insurer's claim, and because the insurer does not offer any further justification or authority supporting such a rule, we decline to adopt the rule urged by the insurer.

Aside from these challenges, we agree with the insurers that the use of the term "or" in the exclusion and its exception simply serves to distinguish different types of polluting events which may occur, and does not, as Key Tronic suggests, support the conclusion that if one phase of dispersal is nonaccidental all phases are.

The relevant inquiry is whether there has been a polluting event. The insurers urge, and the trial court here agreed, that the relevant polluting event is the initial deposit of the wastes into the sanitary landfill. Depending upon the circumstances, the initial depositing of wastes may be a polluting event. For example, the dumping of toxic wastes into a lake could fit this category, as well as so-called "midnight dumping" along a county road.

However, where wastes are deposited in a sanitary landfill, the escape of polluting materials from the landfill is the relevant polluting event. In *Queen City Farms* we

addressed the argument raised on cross appeal by the insurers in that case that summary judgment should have been granted because as a matter of law the deliberate disposal of toxic materials into waste disposal pits was not accidental and was excluded under the same qualified pollution exclusion at issue in this case. We determined in *Queen City Farms* that the initial deposit of toxic materials at a waste disposal site or sanitary landfill is not the relevant polluting event where the deposit of the materials was a landfill or similar site which was believed would contain the materials.

As discussed in *Queen City Farms*, these are general comprehensive liability policies, whose purpose is to insure for all risks and damages arising from an "occurrence" unless excluded. Obviously, business losses are within the broad coverage provided. These policies do not cover any and all losses, however. Instead, limitations on losses exist, and fall, generally speaking, into the categories of expected losses and intentional losses. "Expected losses frequently are not covered by insurance because they are more like business expenses than true risks; these losses can be predicted and calculated in the course of responsible business planning efforts." *Queen City Farms*, at 93 (quoting Nancer Ballard & Peter M. Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion*, 75 Cornell L. Rev. 610, 628 (1990)).

Under settled principles of construction, an insurance policy is construed as a whole, with the policy being given "a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." (Citations omitted.) *Queen City Farms*, at 65 (quoting *Grange Ins. Co. v. Brosseau*, 113 Wn.2d 91, 95, 776 P.2d 123 (1989)). Undefined terms are to be given their plain, ordinary, and popular meaning. *Queen City Farms*, at 65.

As we explained at some length in *Queen City Farms*, at 77-80, the pollution exclusion refers to polluting events, *i.e.*, the "discharge, dispersal, release or escape" of the polluting matter, and these terms have plain, ordinary, and popular

meanings indicating that the relevant polluting event is the escape or release of the matter from a place of confinement. This common understanding of the terms used is particularly apt in light of the principle that the meaning to be accorded insurance terms is that of the average purchaser of insurance. As we concluded in *Queen City Farms*, at 79-80, the average purchaser of insurance would have been justified in thinking that insurance coverage was provided where business wastes were deposited in a sanitary landfill which was believed would contain the waste or safely filter it. Where the escape, and the resulting damage, was not expected, the loss would be reasonably understood by the average purchaser of insurance to fall within the broad coverage of a comprehensive general liability policy.

For these reasons, we held in *Queen City Farms*, at 79-80, that

> the relevant polluting event is the discharge, dispersal, release, or escape of toxic material into the environment, and where material has been deposited in a place which was believed would contain or safely filter the material, such as a waste disposal pit or sanitary landfill, the polluting event is the discharge, dispersal, release, or escape from that place of containment into or upon the land, the air or water, including groundwater.

We repeat, however, that an initial deposit of waste materials onto the ground may be, factually, the relevant polluting event where waste materials are dumped or discharged onto the land or into the water or air without a belief that the materials would be contained. Cases involving sanitary landfills and the like, which are believed to be safe places of containment or filtration, are simply not the same as those cases where materials are dumped with knowledge or expectation that they will migrate or disperse into the environment, or where the intentional polluter is involved. *See Queen City Farms*, at 92.

If there has been a polluting event, the next question is whether the resulting damage is covered under the exception to the qualified pollution exclusion set forth in the last clause of the exclusion. That is, was the polluting event

"sudden and accidental"? Again, this subject is covered at great length in *Queen City Farms*. There, we held the term "sudden and accidental" is ambiguous. As we explained in *Queen City Farms*, the term "sudden" has more than one reasonable meaning, as this court has previously recognized. *See Queen City Farms*, at 80-82; *Anderson & Middleton Lumber Co. v. Lumbermen's Mut. Cas. Co.*, 53 Wn.2d 404, 333 P.2d 938 (1959), *cited and quoted in Queen City Farms*, at 80-81, 91.

■ ■ To aid in interpretation, the parties may offer extrinsic evidence to resolve the ambiguity. *American Star Ins. Co. v. Grice*, 121 Wn.2d 869, 874, 854 P.2d 622 (1993), *opinion supplemented*, 123 Wn.2d 131, 865 P.2d 509 (1994). The goal is to ascertain *the parties' intent, i.e.,* their *mutual* intent. *See Greer v. Northwestern Nat'l Ins. Co.*, 109 Wn.2d 191, 200, 743 P.2d 1244 (1987); *Berg v. Hudesman*, 115 Wn.2d 657, 663, 801 P.2d 222 (1990). Intent is determined

> by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.

(Citations omitted.) *Greer*, at 200 (quoting *Stender v. Twin City Foods, Inc.*, 82 Wn.2d 250, 254, 510 P.2d 221 (1973)).

■ Key Tronic argues that drafting and marketing history of the pollution exclusion is relevant extrinsic evidence because it is evidence of the insurers' intent of the meaning of the pollution exclusion. We cautioned in *Berg*, where a lease was at issue, that the intent of the drafter is not relevant unless it expresses the intent of the parties. *Berg*, at 662 n.1. It is fundamental that the intent to be ascertained is the *mutual* intent of the parties.

Whether the drafting and marketing history is evidence of such intent may be doubted, although we do not foreclose the possibility. As we noted in *Queen City Farms*, at 83, the qualified pollution exclusion is a nonnegotiated standard provision drafted by the insurance industry without participation by the insureds. If, however, it is established that Key

Tronic was aware of the drafting and marketing history, as a surrounding circumstance of the particular insurance contracts at issue here, then such evidence may be relevant as to the mutual intent of the parties.

If there is no extrinsic evidence offered to resolve the ambiguity in the pollution exclusion, or if extrinsic evidence which is offered does not clarify the contract, then the ambiguity will be resolved against the insurer. *See Greer*, at 201.

In *Queen City Farms*, the parties offered no evidence of the parties' mutual intent as to the meaning of the exclusion. We therefore construed the exclusion according to the reasonable interpretation proposed by the insured. We said the insured was entitled to rely upon published appellate decisions for a reasonable interpretation of the exclusion, and there is no impropriety involved if that interpretation is one which courts have recognized as having been advanced at least in some states by representatives of the insurance industry. *See Queen City Farms*, at 83-89.

Thus, while not considered as extrinsic evidence of the parties' mutual intent, some history of the exclusion was considered in *Queen City Farms* in resolving the ambiguity in the exclusion insofar as that history represented a reasonable construction of the policy language. We concluded that, like the "unexpected and unintended" language of the occurrence clause, the "sudden and accidental" exception language means "unexpected and unintended". However, the focus of the exclusion is on the polluting event, not damage. Thus, we rejected the argument that the drafting history reflected in published appellate decisions supported the interpretation that the pollution exclusion and the occurrence clause are entirely coextensive. That interpretation conflicts with the policy language, and is not reasonable.

We summarized our analysis in *Queen City Farms* as follows:

[W]e conclude the qualified pollution exclusion is ambiguous. Resolving the ambiguity favorably to the insured and cover-

age, and against the insurer, we agree that a reasonable construction of the policy language is that damage resulting from one of the named polluting events is not covered, unless that polluting event was unexpected and unintended. Where the facts establish that materials were placed into a waste disposal site which was believed would contain or safely filter them, but, in fact, the materials unexpectedly and unintentionally are discharged or released into the environment, or disperse or escape into the environment, there is coverage for the resulting damage. Under such a scenario, the exception to the exclusion would apply: The discharge, dispersal, release or escape would be sudden and accidental and therefore coverage would be afforded.

*Queen City Farms*, at 91-92.

Finally, Key Tronic argues in reliance on *United Pac. Ins. Co. v. Van's Westlake Union, Inc.*, 34 Wn. App. 708, 664 P.2d 1262, 39 A.L.R.4th 1040, *review denied*, 100 Wn.2d 1018 (1983) that coverage is precluded only for "active polluters". The term "active polluters" does not appear in the policy language and adds little to the analysis; it has no particular legal significance. However, as explained in *Queen City Farms*, at 90, where occurrence-based policies provide coverage for damage which is neither expected nor intended, there is of course no coverage under the occurrence clause where the *damage* is expected or intended. If damage results from a *polluting event* which is expected or intended, then coverage is excluded under the qualified pollution exclusion.

In light of the analysis here and in *Queen City Farms*, it is apparent that summary judgment must be reversed. Key Tronic presented ample evidence that the Colbert sanitary landfill was believed to be a safe place in which to dispose of the hazardous wastes. Key Tronic presented evidence that based on available knowledge at the time, Key Tronic and the County believed the disposal of the wastes was environmentally sound and proper, and that Key Tronic believed the wastes would either evaporate or be absorbed by garbage.

There thus remain material questions of fact about whether Key Tronic disposed of the wastes in a landfill which was believed would contain or safely filter the wastes. Further, if the ambiguity in the pollution exclusion (the

"sudden and accidental" language of the exception) is resolved against the insurer on remand, and in accord with the "unexpected and unintended" interpretation approved in *Queen City Farms*, then there are also material questions of fact about whether the subsequent migration of the toxic materials from the landfill was "sudden and accidental", *i.e.*, unexpected and unintended.

Summary judgment is reversed, and this case is remanded for further proceedings.

ANDERSEN, C.J., and UTTER, DOLLIVER, SMITH, and JOHNSON, JJ., concur.

MADSEN, J. (dissenting) — I dissent. In *Queen City Farms, Inc. v. Central Nat'l Ins. Co.*, 126 Wn.2d 50, 882 P.2d 703, 891 P.2d 718 (1994) a majority of this court rejected the interpretation of the pollution exclusion in *United Pac. Ins. Co. v. Van's Westlake Union, Inc.*, 34 Wn. App. 708, 664 P.2d 1262, 39 A.L.R.4th 1040, *review denied*, 100 Wn.2d 1018 (1983). This court acknowledged that *Van's Westlake* erred in equating the pollution exclusion with the occurrence clause. *Queen City Farms*, at 88. We recognized that the focus of the pollution exclusion is the polluting event, whereas the focus of the occurrence clause is on the damage. *Queen City Farms*, at 88. Today, the majority affirms its disapproval of the analysis in *Van's Westlake* in one breath, then, in the next breath resurrects it, albeit wrapped in a thin disguise. This metamorphosis is accomplished by restating the *Van's Westlake* occurrence analysis and by giving the amorphous "active polluter" a new identity as the bad polluter. Majority, at 631. In this case Key Tronic is beneficiary of the tortured analysis which creates an exception to the pollution exclusion for the good polluter. The majority creates this exception in the face of the exclusion's unambiguous language by announcing that the polluting event to which the exclusion applies is a changeable event, depending on whether a good or bad polluter discharged the contaminants. First, the majority

acknowledges that the "term 'active polluters' does not appear in the policy language and adds little to the analysis" and that "it has no particular legal significance", yet in the next sentence makes its own similar yet equally artificial distinction to penalize only the bad polluter. Majority, at 631. This distinction is made by formulating two different polluting events to which the pollution exclusion may apply. Under the majority's analysis, if the polluting is done by a bad polluter then the exclusion relates to the initial dumping of contaminants. However, when a responsible polluter (one who mistakenly thinks that his pollutants will not migrate and cause damage) is involved, then the focus of this very same pollution exclusion is not the initial dumping but rather, the "secondary" event, the migration. Majority, at 628. Thus, depending on the circumstances, such as "midnight dumping" (by the bad polluter), the initial depositing of wastes may be the polluting event. Majority, at 626. However, where the contaminants are deposited into a landfill (by the good polluter), then it is a second event, the escape of contaminants, which is the relevant polluting event. Majority, at 626. Next, to effectuate this double standard the majority says that "[i]f damage results from a *polluting event* which is expected or intended, then coverage is excluded under the qualified pollution exclusion". Majority, at 631. In this way, only the bad polluter will be denied coverage. Although the words are turned around, this sentence merely restates the *Van's Westlake* proposition which the majority purports to reject. The better-reasoned approach, and the one followed by a majority of courts throughout the country is that the pollution exclusion focuses on the initial polluting event while the occurrence clause focuses on damage. *See Queen City Farms*, at 132, (Madsen, J., dissenting). If that initial polluting event is neither "sudden" nor "accidental" then coverage is excluded. Under this analysis, the trial court in this case correctly granted summary judgment since the discharges by the Appellant were routine, intentional and repeated frequently over a 5-year period and thus, neither "sudden" nor

634

"accidental". The judgment of the trial court should be affirmed.

DURHAM and GUY, JJ., concur with MADSEN, J.

Reconsideration denied March 22, 1995.