[No. 64337-1-I.   Division One.   March 14, 2011.]

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, *Respondent*, v. THE TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, *Appellant*.

---

266

*Pamela A. Okano* (of *Reed McClure*); *Lawrence Gottlieb* (of *Betts Patterson & Mines PS*); and *Lisa C. Neal*, for appellant.

*Michael E. Ricketts* (of *Gordon Thomas Honeywell Malanca Peterson & Daheim PLLC*); and *Philip A. Talmadge* and *Peter Lohnes* (of *Talmadge/Fitzpatrick*), for respondent.

¶1 LAU, J. — This is an insurance coverage dispute between two excess insurers over which policy must respond to losses suffered by a nursing facility severely damaged by flood. On cross motions for summary judgment, the trial court construed the insurance policies to require The Travelers Property Casualty Company of America to provide $11 million flood and "ordinance or law" coverage before Certain Underwriters at Lloyd's London's (Lloyd's) excess flood policy attached. But because the Lloyd's policy unambiguously provides that it attaches when Travelers admits liability for $1 million, as Travelers has done, we reverse summary judgment in Lloyd's favor and remand with instructions to enter summary judgment in Travelers' favor.

## FACTS

¶2 The material facts are undisputed. Evergreen Washington Healthcare Centralia LLC leased an 18,000 square foot skilled nursing facility in Centralia, Washington. Because the lease required Evergreen to maintain property insurance, Evergreen's insurance agent sought insurance for Evergreen's facilities. The Centralia facility and two California properties are located in high-risk flood areas designated by Federal Emergency Management Agency (FEMA) as "Flood Zone A." Evergreen obtained three layers of flood insurance coverage.[1] Lloyd's coverage is excess of

---

[1] "Liability insurance coverage is provided by a single primary layer of coverage and can be followed by one or more layers of excess insurance. . . .

"Excess insurance may . . . be written by design based upon a carefully planned insurance program. This type of insurance commonly is referred to as 'following form' or 'specific' excess coverage. Most major corporations purchase multiple layers of excess insurance to cover losses potentially aggregating in the millions of dollars. The premium paid by the insured for each successive layer of coverage is normally proportionately less expensive than for the immediate underlying layer. . . .

"The following form policy generally provides that the exact same risks are covered as are covered by underlying insurance." Michael M. Marick, *Excess Insurance: An Overview of General Principles and Current Issues*, 24 TORT & INS. L.J. 715, 716-18 (1989).

Travelers, and both are excess of FEMA-issued National Flood Insurance Program (NFIP) flood insurance.[2] The Lloyd's policy follows Travelers' form.[3]

### The Travelers Policy

¶3 The Travelers' policy is a "manuscript commercial property insurance policy." Travelers' Mot. for Partial Summ. J. at 3. This policy, number KTJ-CMB-545D848-3--07, is an "all risk" policy, which means the policy provides coverage for all risks of direct, physical loss to covered property that are not otherwise excluded.[4] This policy provided $277,120,000 in blanket coverage[5] for buildings and $36,488,000 blanket coverage for business personal property. The policy was effective during the relevant period of June 1, 2007, to June 1, 2008. Through the property coverage form in this policy, Travelers agreed to pay for direct physical loss or damage to covered property, caused by or resulting from a covered cause of loss, and for

---

[2] Congress established the NFIP to provide insurance for flood because "many factors have made it uneconomic for the private insurance industry alone to make flood insurance available to those in need of such protection on reasonable terms and conditions." 42 U.S.C. § 4001(b)(1). The NFIP policy is not at issue in this appeal.

[3] While Travelers' policy is the first excess layer of flood insurance, it is the primary layer of property insurance for Evergreen for losses caused by other perils and Lloyd's policy follows the form of the Travelers policy. A "follow form" policy is an excess policy that insures the same risks as, but in excess to, the coverage provided by a lower level policy. *See Hartford Accident & Indem. Co. v. Chi. Hous. Auth.*, 12 F.3d 92, 95 (7th Cir. 1993). "Following form" coverage follows the same terms and conditions as the underlying policy. *Acadia Ins. Co. v. Am. Crushing & Recycling, LLC*, 475 F. Supp. 2d 168, 174 (D. Conn. 2007).

[4] An all-risk policy covers any peril that is not specifically excluded in the policy. *Nw. Bedding Co. v. Nat'l Fire Ins. Co. of Hartford*, 154 Wn. App. 787, 791, 225 P.3d 484 (2010).

[5] "Blanket coverage" insures property collectively without providing for a distribution of insurance to each item. *Abraxas Grp., Inc. v. Guar. Nat'l Ins. Co.*, 648 F. Supp. 304, 305 (W.D. Pa. 1986). In contrast, "specific" insurance provides a specific amount of insurance for each item or each property. *See Ins. Co. of N. Am. v. Fireman's Fund Ins. Co.*, 471 S.W.2d 878, 882 (Tex. Civ. App. 1971).

certain covered costs and expenses, including ordinance or law.[6]

¶4 The main policy form expressly excludes flood, which means it does not provide coverage for any flood-related loss or damage under the policy. But Evergreen purchased an endorsement[7] to the policy that adds back coverage for all loss or damage caused by flood peril. The flood endorsement contains a $1 million sublimit for properties like the Centralia facility located in Flood Zone A.[8] The flood endorsement states, in part:

> E.  The most the Company will pay for the total of all loss or damage caused by Flood in any one policy year is the single highest Annual Aggregate Limit of Insurance specified for Flood shown in the Supplemental Coverage Declarations. This limit is part of, and does not increase, the Limits of Insurance that apply under this policy.

The flood limit in the supplemental coverage declarations states, in part:

> 17.  Flood—aggregate in any one policy year for all losses covered under this policy, commencing with the inception date of this policy:
>   a.  Occurring at Insured Premises within Flood Zones prefixed A as classified under the National Flood Insurance Program:                    $1,000,000

¶5 The "ordinance or law" limit in the supplemental coverage declarations states:

---

[6] The ordinance or law coverage pays, under certain circumstances, for (a) loss to undamaged property caused by enforcement of an ordinance or law regulating the construction or repair of buildings; (b) the cost to demolish and clear the site of undamaged parts of buildings caused by enforcement of building, zoning, or land use ordinances or laws; and (c) the increased cost to repair, rebuild, or construct caused by enforcement of such ordinances or laws.

[7] An endorsement is a "written modification of the coverage of an insurance policy, usually [a] liability or property policy." 1 Steven Plitt, Daniel Maldonado & Joshua D. Rogers, Couch on Insurance 3d § 1:3, at 1-9 (rev. ed. 2010).

[8] The endorsement made flood a covered cause of loss. And it is the coverage provided by the flood endorsement that was made available to Evergreen by this flood loss because, among other things, the loss or damage exceeds the $500,000 limit of the NFIP policy.

12. Ordinance or Law

Loss to the Undamaged Portion, in any one occurrence:
$10,000,000
Demolition, in any one occurrence:          Included
Increased Cost of Construction, in any one occurrence: Included
Included means, included in the Limit shown for Loss to the
Undamaged Portion.

## The Lloyd's Policy

¶6  Because Evergreen could not obtain any more than $1
million in underlying excess limits for its properties located
in Flood Zone A designated areas, it sought $10 million in
excess flood coverage over and above the $500,000 NFIP
and $1 million Travelers' coverage from Lloyd's.[9] Ever-
green's agent (Nicholson & Associates) contacted a United
States broker (US broker) (Crump Insurance Services) in
May 2006 by e-mail:

> The underlying can only offer 2.5 on the CA locations can you
> quote 17.5. Also on the other locations they can only offer 10. I
> need an additional $10,000,000. *Regarding the flood we can
> only get $1,000,000 over the $500,000 flood policy for flood zone
> A* and $10,000,000 for all the other zones. Can you do
> $10,000,000 addl on the other zones? We have 2 or 3 locations
> in flood zone A[.] I believe they are Arvin & Lakeport in CA and
> Centralia in WA.

(Emphasis added.) The US broker sent an e-mail to Lloyd's
United Kingdom broker (UK broker) (Thompson Heath &
Bond Ltd.):[10]

---

[9] An excess insurer is "an insurer whose coverage of a given loss is activated
only after the magnitude of the loss exceeds the limits of applicable 'primary'
insurance. Many policies (especially umbrella/catastrophe policies) are explicitly
written to be excess insurance for most or all coverages under the policy, and make
specific reference to 'underlying' coverages that must be exhausted before the
excess policy will provide coverage. In other circumstances, a policy written as
'primary' insurance may become excess by virtue of the fact that more than one
'primary' policy applies under circumstances where coverage is not prorated
between them." 1 PLITT, MALDONADO & ROGERS, *supra*, § 1:4, at 1-11 to -12.

[10] Thompson Heath & Bond Ltd. is the underwriter for Lloyd's.

Simon, please find submission for 3 locations that need excess flood. The [underlying limit] is $500,000 on Building and Contents with the NFIP and $1[million] included in the property quote with Travelers. I have attached the flood wording for the Travelers policy. Let me know if you need anything else in order to quote.

Attached to this e-mail was, among other things, a NFIP policy endorsement showing $500,000 building and $500,000 contents coverage for flood for the Centralia location and a page from the Travelers' policy that states:

17.   Flood – aggregate in any one policy year, for all losses covered under this policy, commencing with the inception date of this policy:

a.   Occurring at Insured Premises within Flood Zones prefixed A as classified under the National Flood Insurance Program:               $1,000,000

¶7 Seeking confirmation that the Travelers' policy would provide an underlying flood coverage of $1 million in excess of the NFIP's $500,000 primary coverage[11] referenced in the above e-mail, the UK broker asked the US broker, "As these three properties are located in Flood Zone A will we still have an underlying $1 [million] limit excess of the NFIP?"

¶8 In the meantime, Evergreen's insurance agent e-mailed the Lloyd's quote to Evergreen:

On the proposal I have an estimated premium of $10,000 with $1,000 for taxes and fees. The actual quote came in at $20,000 plus taxes and fees. *The quote is for $10,000,000 agg[regate] over NFIP and Travelers Flood zone A $1,000,000 agg[regate].*

. . . .

I need approval from you to go ahead with the flood policy.

(Emphasis added.)

---

[11] " 'Primary insurance' is defined as '[i]nsurance that attached immediately on the happening of a loss.' " *Diaz v. Nat'l Car Rental Sys., Inc.*, 143 Wn.2d 57, 62, 17 P.3d 603 (2001) (quoting BLACK'S LAW DICTIONARY 807 (7th ed. 1999)).

¶9 Evergreen approved the quote and authorized the agent to obtain the insurance from Certain Underwriters at Lloyd's London. The US broker e-mailed the UK broker— "Simon, please bind coverage effective 6/1/06 per your indication. No terrorism. I have attached copies of the NFIP policies on the 3 locations as well as the quote page from Travelers showing the $1[million] limit applying to the locations in the NFIP only." Lloyd's then issued a certificate of insurance with an endorsement attached. An endorsement described the Travelers' $1 million limit as "the Total Limit of Liability for all Underlying Excess Insurer(s)."

¶10 Evergreen renewed all the policies the following year. During this renewal process, the UK broker requested the underlying policy numbers and limits information again before issuing the 2007-08 policy. Evergreen's agent e-mailed the US broker the following information to give to the UK broker:

Travelers Ins. Co. KTJCMB4508483-07 $1,000,000 flood zone A

. . . .

Natl Flood Ins. Prog – 2027267182 – Centralia location $500,000 building

¶11 In 2007 when submitting the 2007-08 subscription to Lloyd's, the UK broker discussed the risk associated with the Centralia location:

|  | RISK DETAILS |
| --- | --- |
| SUM INSURED: | USD10,000,000 any one occurrence and in the aggregate |
|  | EXCESS OF |
|  | USD 1,000,000 any one occurrence and in the aggregate |
|  | WHICH IN TURN IS EXCESS OF |
|  | USD 500,000 any one occurrence, per Building in respect of Buildings |
|  | USD 290,000 any one occurrence, in respect of Business Income at Location 1 |

USD 175,000 any one occurrence, in respect of Business Income at Location 2 [Centralia]

USD 275,000 any one occurrence, in respect of Business Income at Location 3

¶12 The Lloyd's Policy's insuring agreement provides for excess flood coverage:

1. INSURING CLAUSE

Subject to the limitations, terms and conditions contained in this Policy or added hereto, the Underwriters agree to indemnify the Assured named in the Schedule herein in respect of Direct Physical loss or damage to the property described in Item 5 of the Schedule while located or contained as described in the Schedule, occurring during the period stated in the Schedule and caused by any such perils as are set forth in Item 4 of the Schedule and which are also covered by and defined in the Policy/ies specified in the Schedule and issued by the "Primary Insurer(s)" stated therein.

And item 4 of the schedule states, "Perils Insured: Flood."

¶13 The "limit" clause defines when Lloyd's policy is triggered:

3. LIMIT

Provided always that liability attaches to the Underwriters only after the Primary and Underlying Excess Insurer(s) have paid or admitted liability for the *full amount of their respective Ultimate Net Loss liability as set forth in Item 9 of the Schedule* and designated "Primary and Underlying Excess Limit(s)" *and then the limits of Underwriters Liability shall be those set forth in Item 10* of the Schedule under the designation "Excess Limit(s)" and the Underwriters shall be liable to pay the ultimate net loss up to the full amount of such "Excess Limit(s)".

(Emphasis added.)

¶14 Items 9 and 10 of the schedule state, in relevant part:

9. Primary and Underlying Excess Limit(s)

> *USD 1,000,000 Ultimate net loss per occurrence* subject to an aggregate limit of
>
> USD 1,000,000 any one Policy year
>
> Which in turn is excess of
>
> USD 500,000 per occurrence, per Building in respect of Buildings
>
> . . . .

10. Excess Limit(s):

> USD 10,000,000 Ultimate net loss per occurrence subject to an aggregate limit of
>
> USD 10,000,000 any one Policy year.

(Emphasis added.)

¶15 The Lloyd's policy defined "ultimate net loss":

> The words "ultimate net loss" shall mean the loss sustained by the Assured as a result of the perils insured against by this Policy, limited by
>
> (i) any sub-limits contained within this Policy or the Policy/ies of the Primary and/or Underlying Excess Insurer(s), and
>
> (ii) making deductions for all salvages, recoveries and other insurances (other than recoveries under the Policy/ies of the Primary and Underlying Excess Insurer(s)).

¶16 And the "uncollectibility of other insurance" clause states, in part:

> Notwithstanding any of the terms of the Policy that might be construed otherwise, *the insurance provided by this Policy shall always be excess over the maximum monetary limits set forth in Item 9 of the Schedule.* . . .

### The Flood

¶17 In December 2007, a flood caused extensive damage to the Centralia facility. Evergreen's flood-related claim includes, among other things, costs for repair of the physical damage and costs necessary to comply with applicable building codes. The NFIP policy paid its $500,000 limits.

Travelers made a $150,000 advance payment under its building coverage. Travelers also acknowledged "a 100% obligation to the insured up to the maximum available flood limit of $1,000,000, subject to the terms and conditions of its policy."[12]

¶18 Travelers claimed that this $1 million flood limit is the most it owed for all flood loss.[13] And to the extent Evergreen incurred losses due to ordinance or law, the $1 million flood limit applies to all loss or damage, including ordinance or law coverage. But Lloyd's took a contrary view. It maintained that Travelers' policy affords Evergreen $1 million in coverage for damage caused by flood and an additional $10 million for ordinance or law coverage. According to Lloyd's, its $10 million coverage obligation is triggered only when these coverage limits have been exhausted.

¶19 Lloyd's brought a declaratory judgment action seeking a determination that the Travelers' policy provided a total of $11 million coverage ($1 million flood sublimit, plus $10 million ordinance or law), which must be exhausted before Lloyd's policy attaches. Travelers, on the other hand, sought a determination that its maximum liability was $1 million. It also sought a determination that Lloyd's policy was responsible for losses that exceeded this $1 million flood limit. Travelers and Lloyd's filed cross motions for summary judgment. The trial court granted Lloyd's motion and denied Travelers' motion. It ruled:

> (a) Travelers Insurance Policy Number KT-J-CMB-545D848-
> -3-07 provides coverage for Evergreen's claim with limits of
> $1,000,000 for damage to covered Property caused by Flood
> and, in addition, with limits of $10,000,000 for "Covered Costs
> and Expenses" for "Ordinance or Law."

---

[12] "Travelers had acknowledged its liability for its $1,000,000 flood sublimit. ([Clerk's Papers at] 461-62, 543)." Br. of Appellant at 17.

[13] Evergreen also took the position that Travelers owed only its $1 million flood sublimit for this loss.

(b) Further, Certain Underwriters at Lloyd's Policy Number B066447256A07 does not attach until after Travelers exhausts its $11,000,000 policy limits.

Travelers appeals.

## ANALYSIS

¶20 Travelers contends the trial court erred by denying its summary judgment motion and granting Lloyd's summary judgment motion. We review an order on summary judgment de novo, performing the same inquiry as the trial court. *Aba Sheikh v. Choe*, 156 Wn.2d 441, 447, 128 P.3d 574 (2006). Interpretation of an insurance contract is a question of law reviewed de novo. *Woo v. Fireman's Fund Ins. Co.*, 161 Wn.2d 43, 52, 164 P.3d 454 (2007).

¶21 "The interpretation of an insurance contract is a question of law, properly decided on summary judgment unless contract terms are ambiguous and contradictory evidence is introduced to clarify the ambiguity." *Estate of Sturgill v. United Servs. Auto. Ass'n*, 84 Wn. App. 877, 880, 930 P.2d 945 (1997). The meaning and validity of parties' respective insurance policies is resolved as a matter of law. *Safeco Ins. Co. of Ill. v. Auto. Club Ins. Co.*, 108 Wn. App. 468, 472, 31 P.3d 52 (2001).

¶22 Insurance policies are construed as contracts. *Findlay v. United Pac. Ins. Co.*, 129 Wn.2d 368, 378, 917 P.2d 116 (1996). "Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to and made a part of the policy." RCW 48.18.520. If there are two insurance policies, the court will preserve the integrity of each if they can be read together without conflict. *Mission Ins. Co. v. Guarantee Ins. Co.*, 37 Wn. App. 695, 701, 683 P.2d 215 (1984). An insurance policy is construed as a whole, with the policy being given a " 'fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.' "

*Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co.*, 124 Wn.2d 618, 627, 881 P.2d 201 (1994) (quoting *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 65, 882 P.2d 703, 891 P.2d 718 (1994)).

¶23 " 'The touchstone of contract interpretation is the parties' intent.' " *Go2Net, Inc. v. CI Host, Inc.*, 115 Wn. App. 73, 83-84, 60 P.3d 1245 (2003) (quoting *Tanner Elec. Coop. v. Puget Sound Power & Light Co.*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996)). Washington courts follow the objective manifestation theory of contracts, looking for the parties' intent as objectively manifested rather than their unexpressed subjective intent. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). Thus, a court considers only what the parties wrote, giving words in a contract their ordinary, usual, and popular meaning unless the agreement as a whole clearly demonstrates a contrary intent. *Hearst*, 154 Wn.2d at 504.

¶24 And a court reads a contract as an average person would, giving it a practical and reasonable meaning, not a strained or forced meaning that leads to absurd results. *Allstate Ins. Co. v. Hammonds*, 72 Wn. App. 664, 667, 865 P.2d 560 (1994). The court harmonizes clauses that seem to conflict in order to give effect to all the contract's provisions. *Nishikawa v. U.S. Eagle High, LLC*, 138 Wn. App. 841, 849, 158 P.3d 1265 (2007).

¶25 Insurance limitations require clear and unequivocal language. *Bordeaux, Inc. v. Am. Safety Ins. Co.*, 145 Wn. App. 687, 694, 186 P.3d 1188 (2008). Courts construe ambiguities in favor of coverage. *Key Tronic*, 124 Wn.2d at 630.

¶26 Travelers contends that according "to the express terms of that [flood] endorsement, the most that it agreed to pay for 'all loss or damage caused by Flood' is $1,000,000, and since it paid that $1,000,000, Lloyd's $10,000,000 policy obligation has been triggered." Reply Br. of Appellant at 1. "Lloyd's agreed to pay after Travelers admitted liability for $1,000,000." Br. of Appellant at 13. And to determine Lloyd's flood coverage obligation, according to Travelers,

"[the] court must look at the Lloyd's policy . . . . [A]ll of the pertinent provisions in the Lloyd's policy confirm that the parties intended that the Lloyd's policy would be excess over the $500,000 NFIP and $1,000,000 Travelers policy." Br. of Appellant at 13.

¶27 Lloyd's responds by pointing to the Travelers' policy, contending that its policy is triggered only after Travelers pays its ultimate net loss, which is $11 million.

¶28 We turn first to the Lloyd's policy. Lloyd's policy section 3 defines when Lloyd's obligation triggers:

Provided always that *liability attaches to the Underwriters only after the Primary and Underlying Excess Insurer(s) have paid or have admitted liability for the full amount of their respective Ultimate Net Loss liability as set forth in Item 9 of the Schedule* and designated "Primary and Underlying Excess Limit(s)" and the limits of Underwriter's Liability shall be those set forth in Item 10 of the Schedule under the designation "Excess Limit(s)" and the Underwriters shall be liable to pay the ultimate net loss up to the full amount of such "Excess Limit(s)".

(Emphasis added.)

¶29 Item 9 of the schedule quoted above sets forth the NFIP $500,000 flood coverage and the Travelers' $1 million flood coverage. Item 10 quoted above describes the $10 million limits of Lloyd's liability. And section 5 of the Lloyd's policy provides that its policy is liable to pay once the limits set forth in item 9 are met.

Notwithstanding any of the terms of the Policy that might be construed otherwise, *the insurance provided by this Policy shall always be excess over the maximum monetary limits set forth in Item 9 of the Schedule . . . .*

(Emphasis added.)

¶30 Importantly, item 9 makes no mention of the $10 million the Travelers' policy provides for ordinance or law as a covered cost or expense. Read as a whole, these clauses show Evergreen, Travelers, and Lloyd's mutual intent that Lloyd's $10 million flood limit would respond "after the

Primary and Underlying Excess Insurer(s) [NFIP and Travelers] have paid or have admitted liability for [$1 million ultimate net loss per occurrence per Building]" and that its $10 million shall always be excess over [$1,000,000 in excess of $500,000].

¶31 Lloyd's relies on the policy term "ultimate net loss," arguing that this means Travelers must pay its full ultimate net loss before Lloyd's obligation attaches. The Lloyd's policy defines "ultimate net loss":

6. DEFINITIONS

    (a)    The words "ultimate net loss" shall mean the loss sustained by the Assured as a result of the perils insured against by this Policy, limited by

        (i)    any sub-limits contained within this Policy or the Policy/ies of the Primary and/or Underlying Excess Insurer(s), and

        (ii)    making deductions for all salvages, recoveries and other insurances (other than recoveries under the Policy(ies) of the Primary and Underlying Excess Insurer(s)).

¶32 But this argument is not persuasive because the Lloyd's policy's ultimate net loss provision must be read together with the "limit" paragraph in Section 3, quoted above. It states, *"Ultimate Net Loss liability as set forth in Item 9 of the Schedule*[14] . . . ."* (Emphasis added.) "The insurance contract must be viewed in its entirety; a phrase cannot be interpreted in isolation." *Allstate Ins. Co. v. Peasley*, 131 Wn.2d 420, 424, 932 P.2d 1244 (1997). And item 9 makes critical reference to only $1 million in Travelers' coverage, not $11 million. Underscoring this limitation, item 8 of the schedule also states, "Total Limit of Liability for All Underlying Excess Insurer(s)" is $1 million from

---

[14] We note that Lloyd's summary judgment brief below quoted a select portion of Section 3 that omitted the critical phrase "as set forth in Item 9 of the Schedule."

Travelers.[15] The Lloyd's policy unambiguously provides that its liability attached after Travelers paid $1 million, not $11 million. Our review of Lloyd's policy indicates no language that provides its policy would be excess over the Travelers purported $11 million coverage.[16]

¶33 Because contracts are interpreted according to the intent of the parties, which is discerned from the language of the contract and circumstances in which it is formed, we also consider the parties' purchasing history here regardless of whether the language is ambiguous. *Diaz v. Nat'l Car Rental Sys., Inc.*, 143 Wn.2d 57, 67, 17 P.3d 603 (2001).

¶34 As the extrinsic evidence discussed above shows, Evergreen (through its insurance agent and US broker), Travelers, and Lloyd's (through its UK broker) intended that Travelers would provide $1 million maximum coverage for all flood loss. In its May 2006 e-mail, Evergreen's insurance agent notified the US broker, "Regarding the flood we can only get $1,000,000 over the $500,000 flood policy for flood zone A." In response, the US broker sent an e-mail to Lloyd's UK broker that explained Evergreen had

---

[15]

8. (a) PRIMARY INSURER(S)

| Coverage Layer | Total Limit of Liability for Primary Insurer(s) | Insurer | Participation | Policy No. |
|---|---|---|---|---|
| I. . . . . | | | | |
| Location 2 [Centralia] | USD500,000 | National Flood Insurance Program | 100% | 2027267182 |

(b) UNDERLYING EXCESS INSURER(S)

| Coverage Layer | Total Limit of Liability for all Underlying Excess Insurer(s) | Insurer | Participation | Policy No. |
|---|---|---|---|---|
| II. | USD1,000,000 | Travelers Insurance Company | 100% | KTJCMB-4508483-07 |

. . . .

[16] Notably, Lloyd's does not point to any provision in its policy that provides its policy would be excess over $11 million despite Lloyd's agreement to follow Travelers' form.

$500,000 with NFIP and $1 million with Travelers. The broker included the prior year's declarations pages for each of these locations requiring excess flood insurance, along with a copy of the page from the Travelers policy endorsement. The broker also referred the UK broker to the Travelers policy supplemental coverages declarations page by circling the $1 million limit.

> Simon, please find submission for 3 locations that need excess flood. The [underlying limit] is $500,000 on Building and Contents with the NFIP and $1[million] included in the property quote with Travelers. I have attached the flood wording for the Travelers policy. Let me know if you need anything else in order to quote.

¶35 To confirm the Travelers' policy underlying excess limit, the UK broker asked the US broker, "As these three properties are located in Flood Zone A will we still have an underlying $1[million] limit excess of the NFIP?"

¶36 An agent then e-mailed the premium quote to Evergreen:

> On the proposal I have an estimated premium of $10,000 with $1,000 for taxes and fees. The actual quote came in at $20,000 plus taxes and fees. The quote is for $10,000,000 agg[regate] *over NFIP and Travelers Flood zone A $1,000,000 agg[regate].*
>
> . . . .
>
> I need approval from you to go ahead with the flood policy.

(Emphasis added.)

¶37 Evergreen approved purchase of the Lloyd's policy after the US broker told it that Lloyd's was providing "$10,000,000 agg[regate] over NFIP and Travelers Flood zone A $1,000,000 agg[regate]." The US broker asked the UK broker to bind coverage.

> Simon, please bind coverage effective 6/1/06 . . . I have attached . . . NFIP policies on the 3 locations as well as the quote page from Travelers showing the $1[million] limit applying to the locations in the NFIP only.

¶38 For the 2007-08 renewal period, Evergreen's agent e-mailed coverage information to the US broker to send to the UK broker.

Travelers Ins. Co. KTJCMB4508483-07 $1,000,000 flood zone A

. . . .

Nat'l Flood Ins. Prog – 2027267182 – Centralia location $500,000 building

¶39 Lloyd's provides no evidence to rebut clear evidence of the parties' intent—that the Travelers policy would provide a maximum of $1 million coverage for all flood loss. Indeed, the extrinsic evidence here makes clear that the purpose for obtaining the Lloyd's policy was to get $10 million in flood coverage excess of Travelers' $1 million and NFIP's $500,000. Evergreen, Travelers, and Lloyd's all understood that Evergreen could get only $1 million (over NFIP's $500,000) for flood loss. With this common under-standing, Lloyd's agreed to provide $10 million flood cover-age once Travelers paid its $1 million flood sublimit.[17] And we are unpersuaded by Lloyd's passing response to this extrinsic evidence. Lloyd's argued, in part, "[E]xtrinsic evidence demonstrates only that Lloyd's agreed to provide flood coverage excess of Travelers' $1,000,000 Flood limit . . . . [T]he issue is not whether Lloyd's provided flood coverage excess of Travelers' $1,000,000 flood limit. The issue is whether Travelers provided Ordinance or Law coverage up to $10,000,000." Br. of Resp't at 26. In essence, Lloyd's contends the extrinsic evidence here is irrelevant. We disagree for the reasons discussed above.

¶40 Lloyd's counters, not by explaining flood coverage under its policy, but rather, by pointing to the Travelers policy. Lloyd's relies primarily on section O of the general conditions in the Travelers policy:

---

[17] After the loss, Evergreen's insurance agent wrote:

"We have all agreed from the beginning that Travelers had a $1,000,000 sub limit that applied to this location and flood zone in Centralia, Washington. Also, FEMA has paid out their entire limit of $500,000 to Evergreen Centralia . . . . It's now Travelers time and turn to pay Evergreen the $1,000,000 for the damages and value of the building with the proceeds provided by our insurance contract . . . .

. . . FEMA has settled their building claim, then with Travelers settling the next building coverage layer, it will allow for settlement of the excess Lloyd's protection."

> 2. Under the Property Coverage Form, unless otherwise stated in the Supplemental Coverage Declarations, or by endorsement:
>
>    . . . .
>
>    b. The Limits of Insurance that are specified for the remaining Covered Costs and Expenses [including Ordinance or Law] are *in addition to* the Covered Property Limit(s) of Insurance.

(Emphasis added.)

¶41 Lloyd's asserts subparagraph 2.b. means the $10 million ordinance or law is "in addition" to the $1 million sublimit provided for under the flood endorsement. But this argument is flawed for two reasons. First, section O provides that the ordinance and law coverage is "in addition to Covered Property Limit(s) of Insurance." But the $1 million flood coverage limitation for flood losses is not a covered property limit.

¶42 The property coverage form provides in relevant part:

> Coverage is provided for *Covered Property . . . , as described in Section*[ ] *B.1 . . . ,* for which the Insured has an insurable interest . . . . *Coverage applies only when a Limit of Insurance is shown in the Supplemental Coverage Declarations for the specific type of Covered Property . . . .*

(Emphasis added.)

¶43 Section B.1, in turn, lists specific types of property that constitute covered property.[18] It lists, for example, "Buildings," "Business Personal Property," and "Electronic Data Processing Equipment." Because the phrase "Covered Property Limit(s) of Insurance" in section O of the general conditions refers only to the limit(s) of insurance applicable (the various types of covered property listed in section B.1), we conclude it does not include the $1 million limitation on coverage for flood losses. Lloyd's interpretation of the

---

[18] This, however, assumes that a limit of insurance is listed in the supplemental declarations.

covered property limit(s) clause is not reasonable. And an average purchaser of insurance would understand that flood is a peril—not property.

¶44 Next, even assuming Lloyd's interpretation is correct, section O expressly provides that the phrase "in addition" applies "unless otherwise stated in the supplemental coverage declarations or by endorsement." And because flood is an excluded cause of loss under the property coverage form,[19] any coverage for Evergreen's claim is provided for in the flood endorsement. Here, the flood endorsement provides a maximum $1 million in coverage for "all loss or damage caused by Flood"[20] and leaves the flood exclusion in place for all other flood-related losses. The supplemental coverage declarations also provide:

> 17. Flood – Aggregate in any one policy year, *for all losses covered under this policy* . . .
>
> a. Occurring at Insured Premises within Flood Zones prefixed A *$1,000,000*

(Emphasis added.)

---

[19] Lloyd's assertions seek to add back the limits for other coverages, like ordinance and law, that would be excluded if not for the flood endorsement. The Travelers policy insuring agreement defines "Covered Cause of Loss" as "risks of direct physical loss unless the loss is excluded in Section D., Exclusions . . . ." Section D, exclusions of the property coverage form expressly excludes flood as a covered cause of loss. The portion of the coverage provision of the property coverage form providing for ordinance or law costs or expenses coverage requires a "Covered Cause of Loss." Therefore, under the property coverage form, there is no coverage for ordinance or law expenses incurred in connection with flood losses.

While Lloyd's correctly asserts flood is added to the "Covered Cause of Loss" through the flood endorsement, the endorsement does not delete the flood exclusion from the Travelers policy. Instead, it makes the flood exclusion inapplicable to the insurance specifically provided by the flood endorsement. Thus, the insurance specifically provided by the flood endorsement is limited to "the total of all loss or damage caused by Flood . . . ." And the coverage created by the flood endorsement is capped by the limit in the supplemental coverage declarations, while the flood exclusion continues to apply. In short, Travelers' policy excludes damage caused by flood but provides limited coverage by endorsement.

[20] The flood endorsement limits "all loss or damage caused by Flood" to the "single highest Annual Aggregate Limit of Insurance specified for Flood shown in the Supplemental Coverage Declarations." Lloyd's argues that the single highest annual aggregate limit of insurance specified for flood is $10 million for ordinance or law, not $1 million for flood. But the ordinance or law provision is not "specified for flood." We do not find Lloyd's construction of this provision reasonable in the context of the Travelers policy as a whole.

¶45 We conclude that Travelers' policy unambiguously provides that the $1 million limitation on coverage for flood losses applies to "*all* losses covered under [the] policy" including physical damage and ordinance and law expenses.[21]

## CONCLUSION

¶46 For the reasons discussed above, we conclude the Lloyd's policy clearly and unambiguously provides that its liability for $10 million in flood coverage is triggered once Travelers has admitted liability for its $1 million flood sublimit. We reverse summary judgment in Lloyd's favor and remand with instructions to enter summary judgment in Travelers' favor.

LEACH, A.C.J., and SPEARMAN, J., concur.

---

[21] Lloyd's asserts the Travelers policy is ambiguous and the ambiguity must be construed in favor of coverage. We disagree. "[A] contract provision is not ambiguous merely because the parties suggest opposite meanings." *Martinez v. Kitsap Pub. Servs., Inc.*, 94 Wn. App. 935, 944, 974 P.2d 1261 (1999).

We also find Lloyd's reliance on the boiler and machinery endorsements in relation to the business income, rental value, and expense coverages unpersuasive. These coverages are not covered costs and expenses subject to the "in addition to" language in section O.